**STATE of Tennessee**

v.

**David Kyle GILLEY.**

Court of Criminal Appeals of Tennessee, at Nashville.

Assigned on Briefs March 18, 2008.

Aug. 13, 2008.

Application for Permission to Appeal Denied by Supreme Court Feb. 17, 2009.

See also, 173 S.W.3d 1.

James O. Martin, III, and Richard McGee, Nashville, Tennessee (on appeal); and Roger May and Ed Ryan, Nashville, Tennessee (at trial), for the appellant, David Kyle Gilley.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William Whitesell, District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

The defendant, David Kyle Gilley, appeals from his Rutherford County Criminal Court conviction of premeditated first degree murder. On appeal, the defendant claims (1) that he experienced an unreasonable pre-indictment delay, (2) that the trial court erred in admitting testimony pursuant to Tennessee Rule of Evidence 404(b), (3) that the conviction is unsupported by sufficient evidence, (4) the trial court erred in allowing hearsay testimony from two witnesses, (5) that the trial court erred in denying his motion for a mistrial, (6) that the trial court erred in allowing the State to question a defense witness regarding a letter the witness had written that contained a disparaging remark about a prosecutor in this case, and (7) that the trial court erred by denying a defense request for a jury instruction regarding the State's destruction of evidence. Following our review, in which we address, among the other issues, the standard of review of hearsay rulings, we affirm the conviction.

On March 4, 2002, the Rutherford County Grand Jury charged the defendant with the premeditated first degree murder of Laura Salmon, see T.C.A. § 39-2-202(a) (1982), a crime which occurred on May 31, 1984.

### I. Background: Trial Evidence

The trial began on July 26, 2006. Lourene Mackey, the victim's mother, testified

that the victim was a student at Middle Tennessee State University (MTSU) and worked at Kroger. At the time of her death, the victim had recently moved out of an MTSU dormitory and into the house of her father, John Salmon. Ms. Mackey testified that the defendant and the victim met in 1982 and continued a relationship until the victim's death. Ms. Mackey did not approve of the relationship because the victim would often cry and scream during phone conversations with the defendant. Ms. Mackey did not allow the defendant inside her house.

Mr. Salmon testified that the victim had moved into his house just a few days prior to her death. He last saw her in the early morning hours of May 31, 1984. Mr. Salmon testified that on the evening of the murder, he was "almost certain [the defendant] came over to the house that night" with Kim Roberts, another friend of the victim. Mr. Salmon later went to the crime scene after the police had concluded their search and found the victim's necklace as well as several bloodstained rocks. He turned these items in to the police department.

On cross examination, Mr. Salmon testified that he did not know of relationship problems between the defendant and his daughter and that he was not aware of her seeing any other men besides the defendant.

Brenda Salmon, the victim's stepmother, testified that she last saw the victim the morning of May 31, 1984, when the victim was asleep with her friend Trina in the den of the house. Ms. Salmon became aware of the victim's death when assistant district attorney Guy Dotson came to the house and told her on the evening of May 31, 1984. She testified that the defendant called the house a short time later, and that both she and Mr. Dotson spoke with the defendant. The defendant came to the Salmon residence that evening and went through the victim's belongings without asking permission. Ms. Salmon testified that the defendant left with some letters. She stated that the defendant showed no emotion, did not appear upset or grieving, and never asked any questions about what happened to the victim.

Trina Quisenberry Daniel was a childhood friend of the victim and also worked with her at Kroger. On May 30, 1984, the victim picked her up from work around 11:00 p.m., and the two of them went to a nightclub in Nashville. They returned at approximately 3:30 a.m., and Ms. Daniel spent the night at the Salmon residence. Ms. Daniel went to Kroger with the victim the following morning before the victim's shift began at 9:00 a.m. Ms. Daniel testified that she knew the victim was dating other men besides the defendant, but that the victim asked her to keep the other relationships secret "because she was very scared of what would happen if it was found out."

On cross examination, Ms. Daniel testified that she returned to Kroger for her shift on the day of the murder at approximately 2:00 p.m. She knew the victim's shift ended at 1:00 p.m., and the victim's car was not in the parking lot when Ms. Daniel arrived. When Ms. Daniel was taking groceries out to the parking lot some time between 3:00 and 3:30 p.m., she noticed that the victim's car was back in the parking lot, but in a different place than in the morning.

Sybil Waite testified that she was the victim's supervisor at Kroger on the morning of her murder. The victim's time card showed she worked from 8:55 a.m. until 1:09 p.m. Ms. Waite testified that she had asked her to stay and work late, but the victim declined because she wanted to go to her grandmother's house to swim.

Sharyn Faulk testified that she worked with the victim at Kroger for six months and that they worked together on the morning of her murder. They left Kroger together when their shifts ended, and the victim changed clothes from her work outfit to "just some jeans and a top [and] her brown work shoes." Ms. Faulk testified that the victim told her she was going to her grandmother's house to swim, and she watched the victim get in her car and leave the Kroger parking lot. She knew the defendant was the victim's boyfriend, and she recalled seeing the victim "black and blue" on occasion. Ms. Faulk testified that she told the victim physical abuse should not happen in a relationship, and that she should talk to someone and tell them what was going on.

Billy Daniels testified that he was the manufacturing superintendent at the Heatcraft division of Lennox industries in May 1984 and that Gladys Mears was an employee of Heatcraft at that time. Mr. Daniels recalled that after Ms. Mears learned that a murder had occurred near the route she traveled on the afternoon of May 31, 1984, she told him she had seen someone drive out of the intersection at Twin Oaks and Hall's Pike on the afternoon of May 31, 1984. Ms. Mears told Mr. Daniels that the young man she observed at the intersection looked like the one featured on television and in the newspapers in connection with this murder case. On cross examination, Mr. Daniels testified that Heatcraft was about five to seven minutes in driving time from the intersection in question, and that, based on the time clock cards, Ms. Mears would have been at the intersection at approximately 4:40 or 4:45 p.m. on May 31, 1984.

Ms. Mears testified that on the afternoon of the murder, she was returning from her job at Heatcraft when she saw a two-toned beige Oldsmobile Cutlass with tinted windows at the intersection of Twin Oaks and Hall's Pike. The car was pointed towards Hall's Pike and was sitting on the same side of the road as, and in the proximity of, the rock quarry where the victim's body was recovered. Ms. Mears recalled that she waited for the car to move, but after a while she finally proceeded through the intersection. Ms. Mears testified that when she learned about the murder the next day, she told her co-workers about the car in the intersection. Several months later, officers interviewed her at work regarding the car she had seen in the intersection. Ms. Mears stated that after relating the story to her coworkers, she saw a photograph of the driver of the Cutlass in a newspaper article. Ms. Mears identified the defendant as the driver from a photographic lineup. She told investigators that there was just one person in the car she saw, and that the person was a slender-built male with dark, shoulder-length hair. Based on the position of the man's car seat, she thought he was tall.

Audrey Shaw testified that she worked for the Tennessee Bureau of Investigation (TBI) from January 1982 until March 1993 as a forensic scientist in the trace evidence section. Ms. Shaw testified that she examined numerous items in this case, including the 1976 Oldsmobile Cutlass Salon interior and exterior. She sent hair and soil samples to the Federal Bureau of Investigation (FBI) for analysis. The analysis showed that the soil found on the driver's side of the Oldsmobile matched the mud sample from the road where the victim's body was recovered.

Ronald Rawalt testified that in 1984 he was an analyst for the FBI crime laboratory in the mineralology unit. Mr. Rawalt confirmed that the analysis he performed indicated that the soil found on the driver's side of the Oldsmobile matched the mud sample from the road where the victim's

body was recovered. In his opinion, this evidence indicated that the Oldsmobile was at the crime scene.

Robert Asbury testified that in 1984 he was a detective for the Rutherford County Police Department. He investigated the murder of the victim on May 31, 1984, after Johnnie Muckle came to the sheriff's department and reported finding a body on his farm. Detective Asbury personally videotaped the crime scene, and he and other officers checked the body, photographed the crime scene, and collected evidence. They found an area "consistent with a scuffle [w]here the gravel was matted down and moved around." Detective Asbury testified, "It's pretty apparent something had happened in that area." Blood-stained rocks were found near the scuffle area and around the victim's body. A black "Member's Only" jacket was found tied around the victim's neck. The officers found a pair of Rustler jeans near the victim's head and a pair of Sergio Valente jeans on the lower part of her body "lying on her private area and then they're laid out on top of the leg there."

Detective Asbury testified that the victim had severe injuries and bleeding from head trauma to the left portion of her face and head. The victim was still wearing her bra, and her panties were in her right hand. The rolling up of the victim's bra, and scratches on her back and buttocks indicated she had been dragged. Detective Asbury testified that the victim's car was recovered on either late May 31 or early June 1 at the Kroger where the victim was employed.

Detective Asbury testified that he had no prior knowledge of the defendant until speaking with him the evening of May 31, 1984. The defendant came to the sheriff's department for questioning, but he was not asked to give a formal statement because he was not initially considered a suspect. Detective Asbury testified that the defendant told him that he had seen the victim the night before and that he was supposed to meet her that afternoon but could not find her. Detective Asbury met with the defendant again on June 6, 1984, this time reading him his *Miranda* rights before the interview. The defendant's father was also present. In this second interview, the defendant told the detective that he saw victim at her grandmother's house the night before the homicide. They left the house and had sex in his car outside Bellwood Church, and then the defendant took her back to her grandmother's house. The defendant told Detective Asbury that on the day of the murder, he got off work at 7:00 a.m. and went to bed, not waking up until about 3:00 or 4:00 p.m. The defendant said nothing about anyone being at his house with him. Detective Asbury never spoke to the defendant again after the June 6 interview.

On cross examination, Detective Asbury testified that no formal statement was taken from Johnnie Muckle. He conceded there was no way to tell when the marks in the "scuffle area" had been created. The crime scene was not secured overnight following the discovery, and the officers were not using gloves when they gathered evidence. Detective Asbury testified that it was a mistake not to take notes during his first interview with the defendant. A later interview with either the victim's grandmother or the victim's cousin verified the defendant's claim that he had been at the grandmother's house with victim the night before.

On redirect examination, Detective Asbury testified that he observed what appeared, in his opinion, to be a trail or series of bloodstains leading to the field, and matted grass or "trails" leading to the body.

David Grisham testified that in 1984 he was the chief deputy of the Rutherford County Sheriff's Department. On May 31, 1984, he learned of the victim's murder and went to the crime scene, where he took pictures and helped gather evidence. Officer Grisham testified that there was no effort to block off the crime scene because there were natural barriers protecting it and only members of the sheriff's department were on the scene.

Ralph Lehew testified he was a sergeant with the Rutherford County Sheriff's Department and worked the night shift. Sergeant Lehew discovered the victim's vehicle in the early hours of June 1, 1984. He testified that he knew the victim worked at Kroger on Tennessee Boulevard, so he went to that Kroger and discovered the vehicle in the parking lot at 12:40 a.m. Sergeant Lehew notified the police dispatcher and turned the scene over to detectives when they arrived.

Tom Carmouche testified that he was a TBI agent in 1984 and that he participated in the investigation. He met the defendant during his investigation sometime after the first part of July 1984. Agent Carmouche interviewed the defendant on Sept 6, 1984. During this interview, the defendant stated that he had been in Florida until May 29, 1984. On May 30, 1984, he spent the evening at the victim's grandmother's apartment from 6:30 p.m. until 9:00 p.m., when he and the victim left to have sex. They cleaned themselves with his jeans and returned to her grandmother's house around 10:00 p.m. The defendant stated he and the victim got in their cars, and he followed her part of the way home before driving to his place of work. The defendant claimed this was the last time he saw the victim.

The defendant stated he worked until 7:00 a.m. on May 31, 1984, then went home and slept until around 4:40 p.m. Upon waking, he could not locate the victim. When he called the victim's father that evening, he was advised by an attorney that he needed to come to the sheriff's office because something had happened. The defendant told Agent Carmouche that this was the first he heard of the victim's death.

Agent Carmouche testified that when he suggested that the defendant would have no way of knowing that the victim went straight home after they left her grandmother's house, the defendant "jumped out of his chair visibly agitated and said she wouldn't do that." Agent Carmouche also interviewed Gladys Mears. Ms. Mears selected the defendant's photograph from a six-person photographic array and insisted that he was the individual she had seen at the intersection of Twin Oak Drive and Hall's Pike.

On cross examination, Agent Carmouche admitted that the defendant did not sign the statement he drafted from their interview. The defendant's alleged outburst was not included in the report of the interview.

Rich Gerkin testified that he was a sergeant with the Manatee County Sheriff's Department in Bradenton, Florida. He met with detectives Sharp and Goodwin on May 9, 2000, to assist in their request for a blood draw warrant on the defendant, who was living in Manatee County. The defendant was unavailable at the time, so the Tennessee detectives asked Sergeant Gerkin to interview the defendant for them when he served the warrant. Sergeant Gerkin testified that the defendant was cooperative and accompanied him to the sheriff's department for a blood draw. Sergeant Gerkin interviewed the defendant based on the information he received from the Tennessee detectives. The defendant claimed no knowledge of the rock quarry prior to victim's death. The defen-

dant denied being jealous or physically violent towards the victim, and denied having sex with the victim within the two to three days prior to her death.

Several individuals testified for the State as experts in forensics, serology, and deoxyribonucleic acid (DNA). Blood splatter analysis of the impact blood stains on the victim's body established that the victim was wearing nothing but a bra when she was assaulted with the rocks, and that the jeans and other articles of clothing were placed on the victim's body after the attack. The lack of impact stains on the vegetation indicated that the victim was not assaulted where her body was found. Bloodstains on the victim's arms established that her arms were raised during part of the assault, and the scrapes on the victim's back were consistent with her body being dragged some distance. Impact stains found on the front and side seams of the pair of Rustler jeans found at the scene, established that the Rustler jeans were being worn at the time of assault by someone in "close proximity to the point of impact," such as someone who stood or kneeled over the victim while striking her. However, evidence did not rule out that the stains on the Rustler jeans were caused by a stationary perpetrator and a moving victim. There were no blood stains found on the black jacket, and the Rustler jeans had no stains below the knees.

Serology tests determined that the blood on the rocks at the crime scene was consistent with the victim's blood type. However, the victim had a blood type found in forty five percent of the population, and tests did not reveal when the blood stains were deposited. The tests on vaginal and anal swabs taken from the victim revealed the presence of spermatozoa although a buccal sample was negative. The black jacket on the victim's neck tested negative

for spermatozoa and was not tested for blood. The panties found in the victim's hand tested positive for the presence of spermatozoa. The Rustler jeans tested positive for spermatozoa, but none was found in the crotch area of the jeans.

A sample of the defendant's blood was tested, and the testing revealed that the spermatozoa on the Rustler jeans was either consistent with his blood type or that he could not be ruled out as a contributor. The absence of certain antigens on the Rustler jeans made it possible that more than one source of sperm existed. The Sergio Valente jeans were stained with spermatozoa on the back right leg. Spermatozoa was found on the victim's bra. Testing confirmed that there were no alcohol or drugs in the victim's blood when she died.

DNA testing of the panties showed that they contained DNA from more than two people. One of the contributors to the DNA was the victim, and the defendant could not be excluded as a contributor to the DNA mixture. The victim's DNA was also found on the Sergio Valente jeans. DNA from the victim and the defendant was found on a single location tested on the Rustler jeans.

Doctor Charles Harlan testified that he performed an autopsy on the body of the victim on June 2, 1984. Doctor Harlan found 10 different injuries on the victim that were consistent with her being struck in the head with a blunt object such as a heavy rock. The injuries created a "spider web" of skull fractures. Additionally, he noted discoloration in the victim's eye area consistent with trauma from a fist or another blunt instrument. Doctor Harlan testified that in his opinion, the victim's death occurred as a result of a combination of wounds causing injury to the brain.

Kim Brown, formerly Kim Roberts, testified that in 1984 her family lived across

the street from the victim. On May 31, 1984, the police brought her to the police station to ask her some questions. Ms. Brown testified that she saw the defendant at the police station and that he was "just emotionless. I mean just cold. No emotion." She rode home from the police station with the defendant, who wanted to go to the victim's father's house. At the house, Ms. Brown noticed the defendant going through some of victim's belongings and taking letters. After leaving the house, the two went to a party. The defendant "made a pass" at Ms. Brown that evening at the party, telling her "[the victim is] dead, she won't know." After leaving the party, they discussed the victim's death in a parking lot, and "[the defendant] just—he kept asking me why she cheated on him. You know, why did she do this to me. She deserved what she got. You know, just stuff like that." Ms. Brown testified she left the defendant's car and rode home with another friend of hers, because she "was frightened and . . . just wanted to get away from [the defendant]."

On cross examination, Ms. Brown testified that she was smoking marijuana regularly at time of the victim's death and was high when she made her statements to the police. She denied it affected her memory of the events.

Shelly Davenport testified that she was a sophomore in high school when the defendant was a senior in 1984. She met the defendant at a keg party and left the party and went with him "to the rock quarry off of Twin Oak Drive in Murfreesboro." Ms. Davenport testified that the defendant "asked me if I wanted to end up like Laura Salmon. . . . I asked him who she was and what he was talking about. And he said she was his ex-girlfriend and he killed her." Ms. Davenport told her father about the statements and her father told her to

"keep her mouth shut." She finally told the police about the incident in June 2000.

Brad Craver testified that he met the victim on an evening in March 1984, when he delivered a pizza to the victim's dormitory on the MTSU campus. They went on a date that evening when he got off work, and the victim told Mr. Craver that "[s]he was trying to get away from [the defendant]. She was scared of him."

Dan Goodwin testified that he was a detective with the Rutherford County Sheriff's Department, but that he also knew the victim because she was a "little sister" of his fraternity while he was a student at MTSU. He testified that when the case was reopened in February 2000, he met with Shelly Davenport, who told of her encounter with the defendant and directed him to a spot "probably less than 20 yards" from where the victim's body was recovered. Detective Goodwin returned to Florida on November 13, 2001, to meet with the defendant at his place of employment. The defendant signed a statement following the November 13 interview.

Detective Goodwin testified that in his statement the defendant alleged that his relationship with the victim was "mostly sexual," that they both saw other people, and that neither of them was jealous. The defendant denied being violent towards the victim or any other woman, although he admitted that "[o]ne time [the victim] chipped her tooth when she jumped on me." He denied ever visiting the victim at MTSU or ever spending time in her dormitory room. He denied ever visiting the rock quarry. He denied going to the victim's house with Kim Roberts the evening of the victim's death. Detective Goodwin testified that he had personally seen the victim and the defendant on the MTSU campus together, and that the defendant's 1984 statement claimed he had been to rock quarry twice.

Rutherford County Sheriff's Department Detective Bill Sharp testified that in 2000 he began work on the re-opened investigation into the victim's death. Detective Sharp was present for the November 2001 interrogation of the defendant in Florida. During this interrogation, the defendant said he used a pair of jeans to "wipe off" after sex. When confronted with evidence that the stain on the Rustler jeans was not consistent with "wiping off" and more consistent with someone ejaculating directly onto the jeans, the defendant responded, "I could have done that." Detective Sharp testified that the defendant initially stated the jeans were not his, but later admitted that they probably belonged to him.

Clay Shearon testified he knew the victim through mutual friends and went on "four, five" dates with her in 1984. When he took the victim home after their first date, the defendant "was in the driveway waiting on her. And she said . . . 'Oh, God.' And I said, 'Who's that?' And she said, 'That's Kyle. My ex-boyfriend.' And she asked me not to get out of the car, that she could handle him." Mr. Shearon testified that the defendant was very agitated and yelled at the victim, asking her how Mr. Shearon's "dick tastes." They continued arguing before moving inside.

Mary Hunter Brown testified that she was an MTSU student who served as a resident advisor in the victim's dormitory. She knew the defendant as someone who had visited the victim on visitation nights. She testified that an incident occurred in the "latter part of February or the very beginning of March . . . . We were studying for exams. And [the defendant] had come up for visitation. They were being very loud. Several of the other girls had come to me and asked me to go and ask them to quiet it down, that they were trying to study." Ms. Brown knocked on the door several times, and heard "[v]ery argumentative, very angry," voices coming from the room. The victim finally opened the door, and "it was very apparent that she had been crying. Mascara was smeared all over her face. She had a whelp on her right cheek and her nose was bleeding at that given point in time." Ms. Brown saw the defendant in the room and tried to get him to leave, eventually calling the campus police. She testified that the defendant "called [her] a bitch and told [her] that [she] needed to mind [her] own business. That this was between the two of them." The defendant called the victim "a two-timing bitch and a whore," before grabbing her by the arm and hair and pulling her down the hallway to the stairwell. He lifted her up and over the third floor stairwell. While the defendant had the victim dangling over the ledge he shouted, "I will kill you, bitch. I will drop you and kill you." Ms. Brown testified that the victim later told her that the argument started when the defendant accused her of seeing other men.

Michael Arrington testified that he observed an incident between the victim and the defendant at a school dance. The defendant had the victim by one hand and was jerking her around by the hair as he yelled at her. Mr. Arrington helped separate the defendant and the victim, and he recalled the defendant having "a big wad of her hair in his hands."

Melinda Edwards testified that she knew the victim and defendant in high school and recalled an incident at school when she saw the defendant force the victim's head into the lockers. She testified that the defendant told the victim that she was not going to break up with him, and that she was "almost sure that [she] heard [the defendant] threaten to kill [the victim]." Ms. Edwards recalled another incident which occurred at the "Party Tree,"

an area on Sulphur Springs Road where several hundred kids would meet on weekends and hang out. At the "Party Tree," Ms. Edwards saw the defendant hold the victim by the back of her hair and smash her head against the window of a car door while the victim struggled to get away. Ms. Edwards left the area and reported what was happening to a police officer.

Connie Shelton testified that she also saw the incident at the "Party Tree," as well as an incident at band practice when the defendant grabbed the victim's arm and tried to get her to leave. Ms. Shelton testified that she saw letters from the defendant to the victim in which he apologized, professed his love, and threatened "[t]hat if he couldn't have her, no one would."

Because Mary Lester was seriously ill at the time of trial, her prior sworn testimony was read into evidence. She described the victim and the defendant as having a "seemingly violent relationship," and she testified that she saw bruises on the victim's upper arm that looked like fingerprints. She described an incident when, during a loud argument, the defendant grabbed the victim by both arms and twisted them inwards as he pulled her towards him. The defendant would frequently grab the victim to prevent her from leaving, and Ms. Lester had seen him push the victim against a wall to prevent her from walking away. Ms. Lester described an incident at a flag corps practice, when the defendant drove his car slowly up and down the street next to where she and the victim were practicing. The victim told her that "he keeps doing this. He's following me." The defendant continued to drive up and down the same street for over an hour, only stopping when an adult in charge approached his car and threatened to call the police. While he was driving, the victim was yelling profanities

at his car. Ms. Lester testified that the victim told her she did not want anything to do with the defendant.

Reed Ridley testified that he worked at the Murfreesboro Little Theater and knew the victim from a play they both worked on in 1983. He recalled an incident outside the theater when the defendant was inside a car, the victim was outside the car, and they were arguing. The victim apparently reached in the car to get the keys from the ignition when the defendant rolled the window up on her arm. Mr. Ridley testified that the defendant drove the car from the parking lot, dragging the victim onto the street. When the defendant turned onto the street, the victim's arm "popped" loose, sending her "sprawling."

Ms. Mackey was recalled to testify about an occasion when the victim came into her classroom "extremely upset and crying." As a result of what the victim told her, Ms. Mackey confronted the defendant at school and told him he should not have upset the victim. Ms. Mackey described the defendant's demeanor as unconcerned.

The State rested its case.

James Gage testified that in 1990 he was a detective in the Rutherford County Sheriff's Department. He investigated the victim's murder, and as part of the investigation, he sent some evidence to a private company called Lifecodes for DNA analysis. Detective Gage wanted to obtain blood samples from the defendant and Travis Pardue, who was another suspect. Detective Gage testified he was told by the prosecutor's office to focus his search on the defendant.

Michael Powell, the defendant's brother, testified that on the day the victim was murdered he was working until between 12:00 and 1:00 p.m. When he arrived home, the defendant was asleep in his bed with

his car parked in front of the mailbox. Mr. Powell woke the defendant and told him to move the car, but he never did. Mr. Powell testified that he left the house around 1:30 p.m. for about 90 minutes, and when he returned his father was home, and the defendant was still asleep. Mr. Powell testified he left the house again around 4:30 p.m., and the defendant was just getting up and heading to the shower. Mr. Powell did not notice any marks, bruises, or scratches on the defendant. On cross examination, Mr. Powell admitted writing a letter to the defendant in prison telling him not to worry because he would provide him an alibi in the case. Mr. Powell also admitted writing disparaging words about the prosecutor in this case.

Joanne Skidmore testified that she met the defendant at a party in the summer of 1983. She gave him her phone number and they began dating. She described an incident when, while she was on the phone with the defendant, someone picked up another phone and began screaming at her, and asking who she was, how long she had been seeing defendant, and whether they had been having sex. The third party on the phone threatened Ms. Skidmore's life. The defendant kept saying, "Laura, hang up the phone." Ms. Skidmore testified that the victim would become "very upset" and agitated if she was not the defendant's center of attention. She never saw the defendant start an argument with the victim.

Forensic scientist Terry Laber testified that he began reviewing evidence for the defense in January 2002. He focused on analyzing various pieces of evidence for blood splatter patterns. As part of this analysis, he had an individual don the clothing in question to "see a lot better under those circumstances how the bloodstains could have been transferred to that article." Mr. Laber placed the Rustler

jeans on his daughter, who was five feet, four-and-three-quarter inches tall, and weighed 120 pounds. He noted that on the model, the jeans were barely touching the floor and fit her tightly. He disagreed with the prior findings that the stain on the Rustler jeans was an ejaculation stain because it was not stiff, did not discolor the garment, and contained a mixture of DNA.

On cross examination Mr. Laber testified that the victim was ten pounds lighter and one-and-three-quarter inches shorter than the model he used. He was unsure whether the model and victim had matching hip and waist measurements. Mr. Laber admitted it was possible for the victim's DNA to appear on the jeans from a source other than her vagina, such as skin or blood.

## II. Issues.

### A. Unreasonable Delay and Due Process

■ The defendant contends that the nearly 20–year delay between the offense and his prosecution constitutes an unreasonable delay requiring dismissal of the indictment on due process grounds. Due process principles provide protection from an unreasonable delay between the commission of the crime and the commencement of adversarial proceedings. *State v. Gray*, 917 S.W.2d 668, 673 (Tenn.1996) (holding that "an untimely prosecution may be subject to dismissal upon ... due process grounds ... even though in the interim the defendant was neither formally accused, restrained, nor incarcerated for the offense"). This due process guarantee is found in the Fifth Amendment of the United States Constitution and Article I, sections 8 and 9 of the Tennessee Constitution. *See* U.S. Const. amends. V, XIV; Tenn. Const. art. 1, § 8, 9; *Gray*, 917 S.W.2d at 673.

In *State v. Dykes,* 803 S.W.2d 250 (Tenn. Crim.App.1990), this court, relying upon *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), stated that "[b]efore an accused is entitled to relief based upon the delay between the offense and the initiation of adversarial proceedings, the accused must prove that (a) there was a delay, (b) the accused sustained actual prejudice as a direct and proximate result of the delay, and (c) the State caused the delay in order to gain tactical advantage over or to harass the accused." *Dykes,* 803 S.W.2d at 256. In *Gray,* however, our supreme court observed "that the *Marion–Dykes* approach to pre-accusatorial delay is, in application, extremely one-sided. It places a daunting, almost insurmountable, burden on the accused by requiring a demonstration not only that the delay has caused prejudice but also that the State orchestrated the delay in order to obtain a tactical advantage." *Gray,* 917 S.W.2d at 673. The *Gray* court held that "[i]n determining whether pre-accusatorial delay violates due process, the trial court must consider the length of the delay, the reason for the delay, and the degree of prejudice, if any, to the accused." *Id.*

Later, however, in *State v. Utley,* 956 S.W.2d 489 (Tenn.1997), the supreme court limited the holding in *Gray* to the unique facts of that case and reiterated that "in other cases involving a pre-arrest delay, the due process inquiry continues to be guided by *Marion.*" *Id.* at 495. The supreme court ruled that prejudice "cannot be presumed and instead must be substantiated by the defendant with evidence in the record" and that the due process inquiry under *Marion* also requires proof regarding "the State's use of the delay to gain tactical advantage." *Id.* We note, though, that in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), both the majority and dissenting

opinions placed upon the prosecution the burden of justifying the delay. As a result, the issue of the burden of proof is somewhat muddled. *See, e.g., United States v. Sowa,* 34 F.3d 447, 451 (7th Cir. 1994), *cert. denied,* 513 U.S. 1117, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995) (holding that once the defendant has proved actual and substantial prejudice, the prosecution must provide its reasons for delay, to be balanced against prejudice to determine whether due process has been denied); *Howell v. Barker,* 904 F.2d 889, 895 (4th Cir.), *cert. denied,* 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990). *But see, e.g., United States v. Gouveia,* 467 U.S. 180, 192, 104 S.Ct. 2292, 2300, 81 L.Ed.2d 146 (1984) (observing, in a case involving the right to counsel prior to indictment, that the defendant must prove that the prosecution's delay in bringing the indictment was deliberate and designed to gain an advantage over the defendant); *United States v. Crouch,* 84 F.3d 1497, 1510–14 (5th Cir.1996) (rejecting the balancing approach and holding that defendant must show that the prosecution acted intentionally to gain a tactical advantage), *cert. denied,* 519 U.S. 1076, 117 S.Ct. 736, 136 L.Ed.2d 676 (1997).

There is no question, here, that there was a substantial delay between the offense, which was committed on May 31, 1984, and the indictment, which was filed on March 4, 2002. The record, however, reveals no indication of actual prejudice to the defendant or that the State caused the delay to gain a tactical advantage or to harass the defendant.

 In determining whether a delay has violated due process principles, "the most critical [factor] is the prejudice to the accused." *Jones v. Greene,* 946 S.W.2d 817, 826 (Tenn.Ct.App.1996) (citing *State v. Hallock,* 875 S.W.2d 285, 289 (Tenn.Crim.

App.1993); *Tillery v. State,* 565 S.W.2d 509, 510 (Tenn.Crim.App.1978)); *see State v. Carico,* 968 S.W.2d 280, 285 (Tenn.1998) ("The third factor, and the most important though not determinative in every case, is prejudice to the accused."); *see also State v. James Webb,* No. 02C01–9512–CC–00383, 1997 WL 80971 (Tenn.Crim.App., Jackson, Feb. 27, 1997), *perm. app. denied* (Tenn.1997). In the present case, we cannot say that the delay hampered the defendant in the presentation of his defense. The defendant argues that the delay cost him the testimony of his father as an alibi witness, and that other witnesses suffered from faded memories during their testimony. He has failed, however, to support his claims with evidence. The defendant suggests that Ancil Silvey is a potential alibi witness whose memory of the events on the day of the murder has been hampered over time. However, at the hearing on the defendant's motion to dismiss, the State called Mr. Silvey, who testified that he was not with the defendant or his father on May 31, 1984, as was alleged in the affidavit of Gloria Powell. We agree with the trial court's finding that "the State has produced a credible witness who testified and produced tangible evidence that he was not with the Defendant's alibi witness at the time of the crime," and that "the [d]efendant has failed to persuade . . . [that] the alibi would have been substantiated and crucial to his defense." Further, nothing in the record indicates that any other witness was hampered by diminished memory of details.

We agree with the conclusion of the trial court that "the delay was due to an ongoing investigation as information was sought and suspects were eliminated." Although the investigation continued, to some extent, during the delay, there is no evidence that the State intentionally delayed the indictment for the purpose of

gaining a tactical advantage over the defendant. Accordingly, due process considerations do not require that this court reverse the trial court's denial of the motion to dismiss.

### B. 404(b) Evidence

The defendant next alleges that the trial court abused its discretion by admitting testimony from six witnesses that the defendant had, on prior occasions, been violent toward the victim. The admissibility of this evidence was the subject of a pretrial hearing, and the trial court issued an order allowing only some of the testimony proffered by the State. Both parties appealed the decision, and this court granted an interlocutory appeal and issued a ruling affirming in part and reversing in part the ruling of the trial court. *See State v. David Kyle Gilley,* No. M2003–00499–CCA–R9–CD, 2004 WL 367705 (Tenn. Crim.App., Nashville, Feb. 26, 2004). The supreme court later remanded the case to the trial court, ruling that it was error for this court to have granted the interlocutory appeal. *See State v. Gilley,* 173 S.W.3d 1, 6 (Tenn.2005).

At trial, the following witnesses provided testimony about the defendant's prior violent behavior towards the victim.

Mary Brown described an incident at the victim's MTSU dormitory during which she observed the victim and defendant arguing before the defendant dragged the victim by the hair and arm to the third floor railing, where he dangled her over the side and threatened to drop and kill her. She recalled that the victim had a "whelp" on her face and a bloody nose.

Michael Arrington described an incident at a school dance where the defendant had the victim by one hand and jerked her around by the hair as he yelled at her.

Melinda Edwards described an incident at the high school during which the defendant forced the victim's head into the lockers. Ms. Edwards recalled that the defendant warned the victim not to break up with him and that she was "almost sure that we heard [the defendant] threaten to kill [the victim]." Ms. Edwards recalled another incident at the "Party Tree," when she saw the defendant hold the victim by the back of her hair and smash her head against the window of a car door while the victim struggled to get away. Connie Shelton confirmed the incident at the "Party Tree," and corroborated the testimony of Ms. Edwards.

Mary Lester testified that she saw bruises on the victim's upper arm that looked like fingerprints and described an incident when, during a loud argument, the defendant grabbed the victim by both arms and twisted them inwards as he pulled her towards him. At another time, Ms. Lester saw the defendant push the victim against a wall to prevent her from walking away. Ms. Lester also described an incident at a flag corps practice when the defendant drove his car slowly up and down the street next to where she and the victim were practicing. At that time, the victim told Ms. Lester that "he keeps doing this. He's following me." Ms. Lester testified that the victim told her she did not want anything to do with the defendant.

Reed Ridley recalled an incident outside the Murfreesboro Little Theater when, during an argument, the victim apparently reached into the defendant's car to get the keys from the ignition and the defendant rolled the window up on her arm. Mr. Ridley testified that the defendant then drove the car from the parking lot, dragging the victim onto the street. When the defendant turned onto the street, the victim's arm "popped loose," sending her sprawling.

Prior to each witness' testimony, the trial court conducted a jury-out hearing and determined that each incident was supported by clear and convincing evidence, was relevant to material issues of identity, motive, or intent, and that the probative value of the evidence outweighed any danger of unfair prejudice to the defendant. After each witness testified, the court instructed the jury that the testimony should only be used for the limited purposes of identity, motive, and intent.

■ Evidence of other crimes, wrongs, or acts is not generally admissible to prove that an accused committed the crime in question. Tenn. R. Evid. 404. The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn.2005). The risk is greater when the defendant's other bad acts are similar to the crime for which the defendant is on trial. *Id.* at 239; *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn.1996).

Notwithstanding the general rule, evidence of other crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). To admit such evidence, the rule specifies the following:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

 The trial court's determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *See State v. DuBose,* 953 S.W.2d 649, 652 (Tenn.1997). In reviewing a trial court's decision to admit or exclude 404(b)-type evidence, an appellate court may disturb the lower court's ruling only if there has been an abuse of discretion. *Thacker,* 164 S.W.3d at 240.

 We find no abuse of discretion in the trial court's admission of the evidence. Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent. *See State v. Smith,* 868 S.W.2d 561, 574 (Tenn.1993); *see also State v. Turnbill,* 640 S.W.2d 40, 46–47 (Tenn.Crim.App.1982). The courts theorize that such evidence is probative of the defendant's mens rea at the time of the homicide because it reveals a "settled purpose" to harm the victim. *Smith,* 868 S.W.2d at 574. Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *Id.*

The defendant argues that the only purpose for introducing evidence of his assaults against the victim was to show a propensity for harming the victim. We agree with the defendant that evidence is admissible pursuant to Rule 404(b) only when it is probative of a material issue at trial. *See generally Bunch v. State,* 605 S.W.2d 227, 229–32 (Tenn.1980). Here, the defendant was indicted for first degree premeditated murder, and the State's theory was that the murder was accomplished by driving the victim to a remote location, assaulting her with a blunt object, and then later moving her body to another location. The State was obliged to prove that the killing of the victim was "premeditated and intentional." *See* T.C.A. § 39–13–202(a)(1) (1982). In our view, evidence of the defendant's prior assaults of the victim fits squarely within the *Smith* rule. The evidence established the violent nature of their relationship and the defendant's hostility toward the victim.

 To be sure, Ms. Lester testified about bruises she noticed on the victim even though she did not see the events that caused the bruises. Because this testimony was not relevant and potentially misleading, it should not have been admitted under Rule 404(b). However, we fail to see how the defendant was prejudiced by the admission of this evidence. In the context of the other eyewitness testimony of the defendant's abuse of the victim, the admission of the referenced portion of Ms. Lester's testimony was harmless error. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

Based on the foregoing, we conclude that evidence of the defendant's prior violent behavior toward the victim was probative of the defendant's intent. Although the evidence was prejudicial, based on our review of the facts presented in this case, we hold that the prejudice was not unfair. Moreover, the trial court gave the jury a limiting instruction to guide their treatment of the Rule 404(b) evidence. *See State v. Jordan,* 116 S.W.3d 8, 18 (Tenn. Crim.App.2003) (stating that jurors are presumed to follow the instructions given

them absent evidence to the contrary). Thus, we hold that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Accordingly, the evidence was properly admitted, except for the one portion of Ms. Lester's testimony discussed separately above.

### C. Hearsay

The defendant's next allegation is that certain testimony offered by Brad Craver and Mary Lester was inadmissible hearsay. Specifically, the defendant objects to Mr. Craver's statement that the victim told him she was trying to get away from the defendant because she was afraid of him and Ms. Lester's statements that the victim told her the defendant was following her and that she didn't want anything to do with him.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id.* 802. The Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

First, we note that the guide for a court's determining the admissibility of evidence under the Tennessee Rules of Evidence depends upon which rule is involved. In this regard, the precise standard of review of trial court hearsay determinations has been surprisingly difficult to bring into focus. Recently, our supreme court apparently has hinted that hearsay determinations fall within a general rule that rulings on evidence are entrusted to the sound discretion of the trial court. *See State v. Andre Dotson,* 254 S.W.3d 378, 392 (Tenn., Jackson, 2008) (citing, *inter alia, State v. DuBose,* 953 S.W.2d 649, 652 (Tenn.1997), and *State v. Harris,* 839 S.W.2d 54, 73 (Tenn.1992)); *State v. Judge Brooks,* 249 S.W.3d 323, 328 (Tenn., Jackson, 2008); *see also State v. Thomas,* 158 S.W.3d 361, 400 (Tenn.2005); *State v. Stout,* 46 S.W.3d 689, 697 (Tenn.2001) ("The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court.") (citing *State v. Stinnett,* 958 S.W.2d 329, 331 (Tenn.1997)); *Stinnett,* 958 S.W.2d 329, 331 (Tenn.1997) (applying an abuse of discretion standard to the application of a hearsay exception) (citing *State v. Campbell,* 904 S.W.2d 608, 616 (Tenn.Crim.App.1995), and *State v. Baker,* 785 S.W.2d 132, 134 (Tenn.Crim.App. 1989)). Of course, a lower court's discretionary determination is typically reviewed for an abuse of discretion standard. *See Andre Dotson,* 254 S.W.3d at 392. The precedential history for utilizing the abuse of discretion standard for hearsay issues, however, is somewhat checkered; in some of the notable cases relied upon as precedent, the court did not apply the standard to the review of hearsay issues. *See, e.g., DuBose,* 953 S.W.2d at 653 (applying the abuse of discretion standard to relevancy issues); *Campbell,* 904 S.W.2d at 616 (Tenn.Crim.App.1995) (applying the abuse of discretion standard to the review of the admissibility of expert testimony); *Harris,* 839 S.W.2d at 73 (applying the abuse of discretion standard to a relevancy determination of the admissibility of a photograph) (citing *State v. Allen,* 692 S.W.2d 651 (Tenn.Crim.App.1985)); *State v. Baker,* 785 S.W.2d 132, 134 (Tenn.Crim.App.1989) (applying the abuse of discretion standard to the review of the use of impeachment evidence); *Allen,* 692 S.W.2d at 653–54 (applying the abuse of discretion standard to the review of the admissibility of photographs and otherwise not referring to the standard in reviewing a hearsay issue) (citing *State v. Banks,* 564 S.W.2d 947, 949

(Tenn.1978)); *Banks,* 564 S.W.2d at 949 (applying the abuse of discretion standard to the review of the admissibility of photographs). We know that the supreme court in *State v. Maclin,* 183 S.W.3d 335 (Tenn. 2006), adverted to the general rule of abuse of discretion review of evidentiary questions before commenting that "[h]owever, the issue of whether the admission of hearsay statements violated a defendant's rights under the Confrontation Clause is purely a question of law." *Id.* at 343 (citing *Lilly v. Virginia,* 527 U.S. 116, 125, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)); *see Lilly,* 527 U.S. at 136–37, 119 S.Ct. at 1900 (stating that "when deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause"); *see State v. Lewis,* 235 S.W.3d 136, 141–42 (Tenn.2007) (citing *Maclin*). Additionally, panels of the intermediate appellate courts have applied a de novo standard to the review of hearsay issues. *See State v. Schiefelbein,* 230 S.W.3d 88, 128 (Tenn.Crim.App.2007) ("[A] trial court's ruling on whether a statement is hearsay is a question of law, and the appellate court reviews the issue de novo without a presumption of correctness."); *Russell v. Crutchfield,* 988 S.W.2d 168, 170 (Tenn.Ct.App.1998); *State v. Alonzo Ladon Mason,* No. M2005–01929–CCA–R3–CD, 2007 WL 1174898 (Tenn.Crim.App., Nashville, Apr. 20, 2007); *State v. Frank Lee Tate,* No. W2004–01041–CCA–R3–CD, 2007 WL 570555 (Tenn.Crim.App., Jackson, Feb. 23, 2007), *perm. app. denied* (Tenn.2007); *Sharon Marcel Keisling v. Daniel Kerry Keisling,* 196 S.W.3d 703, 721 (Tenn.Ct.App., Nashville, 2005) ("Whether a certain statement is hearsay is a question of law, subject to de novo review."), *perm. app. denied* (Tenn.2006); *Shelia Rae Gibbs v. Robin Media Group,* No. M1999–00820–COA–R3–CV, slip op. at 3, 2000 WL 1207201 (Tenn.Ct.App., Nashville, Aug. 25, 2000).

■ To find a synthesis, we look anew to the core of a typical hearsay problem. A trial court's first duty is to determine whether the out-of-court declarant's statement is hearsay—that is, whether it is "offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). No factual issue attends this determination, and it necessarily is a question of law. *See Schiefelbein,* 230 S.W.3d at 128; *Sharon Marcel Keisling,* 196 S.W.3d at 721 If the statement is offered to prove the truth of the matter asserted and no exceptions apply, *see* Tenn. R. Evid. 803, 804, the statement is, purely and simply, inadmissible. Tenn. R. Evid. 802. At this juncture, the court has no discretion to hold otherwise, and to utilize an abuse of discretion standard at this point in the analysis " 'would have us defer to a discretion that the trial court does not possess.' " *See State v. Edison,* 9 S.W.3d 75, 78 (Tenn.1999) (quoting Tipton, J.).

■ If the offered statement is hearsay, the next step in most hearsay analyses is to determine whether an exception emanating from Rules 803 and 804 applies. The application of some exceptions may initially depend upon factual determinations. *See, e.g.,* Tenn. R. Evid. 803(1.2) (admission by a party-opponent; occasionally involving determinations, *inter alia,* whether the statement was made in a "representative capacity" or whether a party manifested a "belief in the truth of the statement"), 803(2) (excited utterance; involving a determination whether the statement "relat[ed] to a startling event" or was "made while the declarant was under the stress of excitement caused by the event"), 804(4) (statements

for purposes of medical diagnosis and treatment; involving a determination whether the declarant made the statement for such purpose), 803(5) (recorded recollection; involving a determination whether the witness "once had knowledge" about the matters recorded in the statement), 803(6) (records of regularly conducted activity; involving a determination, for instance, whether the recorded statement as offered was "made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit"), 804(a) (occasionally involving a determination whether a declarant is unavailable because of his or her death or "existing physical or mental illness or infirmity"), 804(b)(2) (statement under belief of impending death; involving a determination whether the declarant made the statement "while believing that the declarant's death was imminent"). To determine whether hearsay falls within one of the exceptions, the court must conclude by a preponderance of the evidence that the preliminary or predicate facts justifying the exception exist. *State v. Stamper,* 863 S.W.2d 404, 406 (Tenn.1993). When called upon to resolve factual issues as predicates to the application of a hearsay rule exception, the trial court may necessarily make credibility determinations and utilize factual inferences, and in such a situation, the appellate court should defer to the trial court's finding of such facts. *See, e.g., State v. Berrios,* 235 S.W.3d 99, 103 (Tenn.2007) ("When the trial court makes findings of fact at the conclusion of a suppression hearing, [for instance,] the findings are binding upon [the appellate court] unless the evidence in the record preponderates against them."); *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996) ("Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in

the evidence are matters entrusted to the trial judge as the trier of fact.").

 If then the trial court makes a factual determination that warrants the application of an exception to the hearsay rule, the operative language of Rules 803 and 804 prohibit the use of the hearsay rule to exclude the evidence. If, pursuant to the above analysis, an exception listed in Rule 803 applies, the statement "[is] not excluded by the hearsay rule," and similarly, if an exception listed in Rule 804, when the declarant is unavailable as a witness, applies, the statement "[is] not excluded by the hearsay rule." Tenn. R. Evid. 803, 804(b).

Just because, however, the hearsay rule may not be used to *exclude* the evidence, the trial court is not necessarily obliged to *admit* the statement. Other rules of evidence, such as principles of relevancy, may have come into play. *See, e.g.,* Tenn. R. Evid. 401, 402 & 403; *see also* Tenn. R. Evid. 803(3), Advisory Comm'n Comments (stating that the application of the state of mind hearsay rule exception, for instance, involves the use of principles of relevancy). The trial court, however, has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence.

 In the present case, the trial court ruled that the testimony of Ms. Lester was hearsay but admissible under the excited utterance exception. *See* Tenn. R. Evid. 803(2). To clear the way for admission of a hearsay statement as an excited utterance, a startling event or condition must be the catalyst for the excitement; second, there must be a nexus between the statement and the startling event; third, the utterance must be forthcoming while the declarant is under the stress of excitement from the event or condition. *State v. Gordon,* 952 S.W.2d 817, 820 (Tenn.1997).

■ Ms. Lester related a startling event, the defendant's repeated, unsettling "drive-bys" of the flag corps practice. The statement by the victim was directly related to the startling event as it was directed toward the defendant's current actions. Finally, the statement was made during the event, while the victim was under the stress of the defendant's actions. The record supports the trial court's findings that the factual bases for the excited utterance exception were present. We discern no error in admitting the testimony of Ms. Lester.

■ The defendant did not object to the testimony of Mr. Craver at trial. Tennessee Rule of Appellate Procedure 36(a) states that appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a); see State v. Sims, 45 S.W.3d 1, 16 (Tenn.2001); Tenn. R. Evid. 103(a)(1). The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal. Moreover, we see no basis for noticing the error despite waiver. See Tenn. R. Crim. P. 52(b).

### D. Sufficiency of Evidence

In his next issue, the defendant claims that the trial court erred by denying his motion for judgment of acquittal because the evidence was insufficient to sustain the conviction.

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insuffi-

cient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(a).

■ This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. See generally Overturf v. State, 571 S.W.2d 837 (Tenn.1978). At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. Hill v. State, 4 Tenn.Crim.App. 325, 470 S.W.2d 853, 858 (1971). The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. State v. Ball, 973 S.W.2d 288, 292 (Tenn.Crim.App. 1998); State v. Anderson, 880 S.W.2d 720, 726 (Tenn.Crim.App.1994). That is, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see Tenn. R. App. P. 13(e).

■ Of critical importance in the present case, this court, in determining the sufficiency of the evidence, should not reweigh or reevaluate the evidence, State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim.App.1990), and questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not the appellate court, State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). Also, this court may not substitute its inferences for those

drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn.Crim.App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

 Moreover, a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn.1973); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn.Crim.App.2003); however, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn.Crim.App.1987) (quoting *Crawford*, 470 S.W.2d at 613).

 Initially, we note that the defendant chose to offer proof following the trial court's denial of his motion for a judgment of acquittal at the close of the State's proof. As such, he has waived his right to appeal the denial of his motion. *See Finch v. State*, 226 S.W.3d 307, 317 (Tenn.2007) (declining to revisit the waiver rule promulgated in *Mathis v. State*, 590 S.W.2d 449, 453 (Tenn.1979)); *see also State v. Johnson*, 762 S.W.2d 110, 121 (Tenn.1988); *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim.App.1998). Accordingly, our review

of the sufficiency of the evidence is not based solely on the evidence offered during the State's case-in-chief but must also necessarily include the proof offered by the defendant.

 The defendant also claims that the sufficiency challenge should be considered with the challenged 404(b) testimony removed from consideration. We note that, regardless of the propriety of the admission of the challenged evidence, the sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which may have been improperly admitted. *See State v. Longstreet*, 619 S.W.2d 97, 100–01 (Tenn.1981).

At the time of the offense in this case, first degree murder was defined in pertinent part as "[e]very murder perpetrated by means of poison, lying in wait, or by other kind of willful, deliberate, malicious, and premeditated killing." *See* T.C.A. § 39–2–202(a) (1982).

 The defendant alleges that the evidence was insufficient to support a finding of first degree murder. We disagree. Expert testimony connected the defendant to a pair of jeans found at the scene of the crime and worn at the time of the attack on the victim. Ms. Davenport testified that the defendant took her to the crime scene and, while there, confessed to having killed the victim. Ms. Mears testified that she saw the defendant at an intersection in the location of the crime scene around the time the crime was committed. The credibility of eyewitness testimony in identifying the defendant as the perpetrator of a crime is a question of fact for the jury to determine upon consideration of all competent proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn.Crim.App.1993). From this evidence, a rational jury could have found beyond a reasonable doubt that

the defendant was the perpetrator of the crime. In addition, from these facts, the jury could have rationally found all elements of the crime of premeditated first degree murder beyond a reasonable doubt. Thus, while the defendant presents only a general insufficiency argument, we hold that the evidence, viewed in the light most favorable to the State, supports every element for premeditated first degree murder.

### E. Motion For Mistrial

The defendant alleges that the trial court erred by denying his motion for a mistrial based on the testimony of Gladys Mears. Specifically, defendant objected to Ms. Mears's testimony that she had seen the defendant's picture in the newspaper in relation to another case after she had been instructed not to testify in this regard. After this testimony, the trial court denied the defendant's motion for a mistrial, but instructed the jury that the defendant has no prior criminal record.

 Whether to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn.Crim.App.1996). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn.Crim.App.1991). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn.Crim.App.1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *Id.* On appeal, this court will disturb a trial court's denial of a motion for mistrial only when there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn.1990); *Williams,*

929 S.W.2d at 388 (Tenn.Crim.App.1996). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn.2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn.2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn.1999).

 Although Ms. Mears's comment was improper, we cannot conclude that the trial court abused its discretion in denying a mistrial. The information was not so prejudicial as to necessitate a mistrial. Ms. Mears did not comment as to the circumstances behind the defendant's picture being in the newspaper, and the trial court immediately provided a curative statement to the jury. Finally, as we have previously discussed in this opinion, the evidence against the defendant was strong and suggests that the jury would have been compelled to convict the defendant in the absence of the erroneous comment. Thus, the record evinces no manifest necessity for a mistrial order, and the trial court did not abuse its discretion in denying one. *See, e.g., State v. Brown*, 53 S.W.3d 264, 284 (Tenn.Crim.App.2000) (no manifest necessity for a mistrial found when the State introduced "a multitude of evidence" against the defendant and the jury was instructed to disregard inappropriate statements; court commenting that juries are presumed to follow court's instructions).

### F. The Cross–Examination of Michael Powell

The defendant next alleges that the trial court erred in allowing the prosecutor to cross-examine Michael Powell, the defendant's brother, with the contents of letters he wrote to the defendant. Mr. Powell's testimony on direct examination offered an

alibi for the defendant, and on cross-examination, the State questioned him about letters he wrote to the defendant which contained disparaging comments about the prosecutor. The defense objected and the State reasoned that the questioning was to show evidence of Mr. Powell's bias. The defendant alleges the questioning regarding the letter was irrelevant and also constituted prosecutorial misconduct.

We begin our analysis by noting that on appellate review, the trial court's determination of admissibility on the issues at hand will not be reversed unless the court abused its discretion in admitting or excluding the challenged evidence. *See, e.g., State v. Bigbee*, 885 S.W.2d 797, 806 (Tenn. 1994).

■■■ Tennessee Rule of Evidence 616 states that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Tenn. R. Evid. 616. Rule 611 provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). Any "feelings that a witness has with regard to a party or issue is an important factor for the trier of fact to consider in assessing the weight to be given to the witness' testimony." *State v. Williams*, 827 S.W.2d 804, 808 (Tenn. Crim.App.1991).

■■■ The trial court did not abuse its discretion in allowing the questioning of Mr. Powell. In his letters to the defendant, Mr. Powell referred to the prosecutor variously as a "dumbass," an "asshole," and a "bastard." Furthermore, he promised the defendant in writing, "Don't worry. I'll give you an alibi." Mr. Powell's letters to the defendant constituted evidence of bias, were relevant to the witness' credibility, and were, therefore, admissible.

In reviewing allegations of prosecutorial misconduct, this court looks to see "whether such conduct could have affected the verdict to the prejudice of the defendant." *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim.App.1990). That analysis involves consideration of five factors:

(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn.Crim.App.1976)). Whether the trial court erred in allowing the complained-of conduct is reviewed for abuse of discretion. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn.1978).

We find no abuse of discretion in this case. Given our finding of relevance and admissibility of the questioning, no further inquiry into prosecutorial misconduct is warranted.

■■■ On appeal, the defendant also claims that the admission of Mr. Powell's letter violated principles of due process and was unduly prejudicial pursuant to Tennessee Rule of Evidence 403. We note, however, that the only objection made at trial was based upon the letters' relevancy. "[A] party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." *State v. Adkisson*, 899 S.W.2d 626, 634–35 (Tenn.Crim.App.1994); *see State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn.Crim.App.1988) (holding that a party cannot object on one ground at trial and

assert new basis on appeal). This court will not consider a theory of exclusion raised for the first time on appeal. *See Adkisson,* 899 S.W.2d at 626; *State v. Matthews,* 805 S.W.2d 776, 781 (Tenn.Crim.App.1990); *Aucoin,* 756 S.W.2d at 715; *State v. Dobbins,* 754 S.W.2d 637, 641 (Tenn.Crim.App. 1988); *State v. Brock,* 678 S.W.2d 486, 490 (Tenn.Crim.App.1984); *see also* Tenn. R. Evid. 103(a)(1).

## G. Jury Instruction Regarding Preservation of Evidence

Finally, we address the defendant's argument that his trial was fundamentally unfair because the trial court denied the defendant's requested jury instruction regarding the State's duty to preserve evidence. Specifically, the defendant argued at trial that because there were missing interview notes and statements from the law enforcement investigation, the jury should be instructed to infer that the missing evidence would be favorable to the defense.

▮▮▮▮ Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. 1, § 6; *see State v. Bobo,* 814 S.W.2d 353, 356 (Tenn.1991); *Willard v. State,* 174 Tenn. 642, 645, 130 S.W.2d 99, 100 (1939). This right encompasses the defendant's right to a correct and complete charge of the law. *State v. Teel,* 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison,* 704 S.W.2d 314, 319 (Tenn.1986); *see State v. Teel,* 793 S.W.2d 236, 249 (Tenn.1990); *see also* Tenn. R.Crim. P. 30. Jury instructions must, however, be reviewed in the context of the entire charge rather than in isolation. *See Sandstrom v. Montana,* 442 U.S. 510, 527, 99 S.Ct. 2450, 2461, 61 L.Ed.2d 39 (1979)

(Rehnquist, J., concurring); *see also Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) ("[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."); *State v. Phipps,* 883 S.W.2d 138, 142 (Tenn. Crim.App.1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges,* 944 S.W.2d 346, 352 (Tenn.1997).

▮▮▮▮ While the defendant may request special instructions, jury instructions are sufficient where they adequately state the law. *See, e.g., State v. Tyson,* 603 S.W.2d 748, 755 (Tenn.Crim.App.1980). When a trial court's charge to the jury is complete, it need not give additional special instructions requested by the defendant. *See State v. Story,* 608 S.W.2d 599, 603 (Tenn.Crim.App.1980). Because the defendant has failed to meet the prerequisites of *State v. Ferguson,* 2 S.W.3d 912, 917 (Tenn.1999), he has likewise failed to establish an entitlement to a jury instruction regarding the allegedly destroyed evidence.

▮▮▮▮ In *Ferguson,* our supreme court ruled that the due process principles of the Tennessee Constitution require that the State's failure to preserve evidence which could be favorable to the defendant must be evaluated in the context of the entire record. *Id.* at 916–17. If the State has a duty to preserve the evidence, the reviewing court must conduct a balancing test based upon the following three factors:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction. *Id.* at 917. If the trial court's consideration of these factors reveals that a trial without the lost or destroyed evidence would be fundamentally unfair, the trial court may dismiss the charges, provide a special jury instruction, or take steps necessary to protect the defendant's right to a fair trial. *Id.*

In the present case, the defendant generally alleges that the State "mishandled, destroyed, and lost evidence throughout the twenty-plus years leading to Mr. Gilley's arrest," and specifically alleges that there was a deliberate destruction of interview notes by the police. We first note that the issue of preservation of evidence was addressed by the trial court in the same pretrial motion to dismiss which addressed the issue of unreasonable delay. On that motion the court held that "the defendant has failed to show he was prejudiced by any lost evidence, and the State succeeded in demonstrating the delay was due to an on-going investigation as information was sought and suspects were eliminated."

On the issue of negligence regarding the evidence preservation, the trial court found "there has been no proof regarding the State's degree of negligence." The general allegation by the defendant that the State mishandled evidence is similarly unsupported on appeal. We find that the disappearance of interview notes can be attributed, as in *Ferguson,* to "simple negligence, as distinguished from gross negligence." *Id.* at 918.

Next, we conclude that the lost evidence in the present case is even less significant than that in *Ferguson,* in which the police had videotaped Ferguson actually performing field sobriety tests. In the present case, the primary accusation is a more general claim that the State lost pieces of evidence over time. There is no indication that any specific piece of missing evidence, including the lost interview notes, had any exculpatory value or could have been expected to play a significant role in the defendant's defense.

Finally, as previously discussed, we observe that the State's other evidence against the defendant was strong. Expert testimony connected the defendant to a pair of jeans that were found at the scene of the crime and worn at the time of the attack on the victim. A witness testified that the defendant took her to the crime scene and, while there, confessed to having killed the victim. The defendant testified that the Rustler jeans found at the scene were "probably" his.

On balance, therefore, we hold that the defendant's trial was not fundamentally unfair and that the defendant has failed to establish that there was missing evidence favorable to the defense. In consequence, the trial court did not err by denying the specially requested instruction on the duty to preserve evidence.

### III. Conclusion

In view of the foregoing analyses, the defendant's conviction and sentence is affirmed.