# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 12, 2012

## STATE OF TENNESSEE v. MONTEZ JAMES

### Appeal from the Criminal Court of Shelby County
### No. 10-04484    J. Robert Carter, Judge

### No. W2011-01213-CCA-R3-CD  - Filed September 24, 2012

Montez James ("the Defendant") was convicted by a jury of five counts of aggravated robbery and four counts of aggravated assault upon nine separate victims. The trial court subsequently sentenced the Defendant as a persistent offender to an effective sentence of seventy years in the Tennessee Department of Correction. In this direct appeal, the Defendant contends that the trial court erred in the following evidentiary rulings: (1) allowing "cumulative" witnesses to testify; (2) allowing a witness to testify about the Defendant's gang involvement; (3) admitting the recording of a co-defendant's guilty plea; (4) admitting testimony about information previously redacted from a co-defendant's statement to the police; and (5) refusing to admit a police report containing the Defendant's statement. The Defendant also challenges the sufficiency of the evidence supporting his convictions and his sentence. After a thorough review of the record and relevant authorities, we have determined that the Defendant is not entitled to relief on any of these issues. Accordingly, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments
### of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Constance Wooden Alexander, Memphis, Tennessee, for the appellant, Montez James.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Amy P. Weirich, District Attorney General; and P. Neal Oldham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

The Defendant was indicted in May 2010 on five counts of aggravated robbery and four counts of aggravated assault committed in December 2009 upon nine separate victims at the Nail Station nail salon in East Memphis, Shelby County, Tennessee. At the Defendant's jury trial conducted in February 2011, the following proof was adduced:

Erika Dailey testified that she worked at the Nail Station as a nail technician. On December 23, 2009, she was working at the Station with two other women, Gina Crawford and Angela Galloway. The owner of the shop, Lois Stockton, was also there. That afternoon, Dailey was about to give Donna Reed a pedicure. Dailey was talking on the phone with her husband when she heard other people asking, "[W]ho are these guys? Who is this coming in here? Look at what they have on." When Dailey looked over, she saw "a guy" standing in front of a table near the front door. She testified, "He had pulled a gun out and told everybody to get on the floor." She stated, "I saw him have a pistol out and wave it around." She told her husband to call the police because they were being robbed.

Dailey testified that there were two men, and when one of them approached her, she threw her phone and rings down and got on the floor. One of the men patted her on the buttocks and asked her where the money was. She told him that the money was under a pillow. The man told her to count to a thousand, and, she testified, she "thought [her] life was over by then."

While she was still counting, the men left. After she got up, she discovered that her money and her phone were missing. Her rings had been left behind. Dailey stated that the police showed up about thirty seconds after the two men left. She also stated that ten people were in the store at the time of the event, including customers. Later, police officers returned her phone and approximately two hundred and fifty dollars. She did not know the total amount of money that had been taken from her. Personal checks that had been written to her also were returned.

On cross-examination, Dailey acknowledged that the two men who entered the salon were Emmanuel Perry and Jeremy Manns. She did not see the Defendant during the episode.

Charlotte Hodges testified that she was getting a manicure at the Nail Station on the afternoon in question. When she heard her manicurist ask, "[W]hat are they doing coming in here?", she looked toward the door and "saw two people in hoodies and[,] you know[,] not your usual person walking in to get a manicure." One of the men asked her manicurist how much a manicure cost. The next thing she heard was one of the men saying,

"[E]verybody lay on the floor." At that point, she thought they were all going to be killed, and she got down on the floor. She saw one of the men holding a gun. Her purse was taken. She got back up after she heard someone say, "call 9-1-1," and realized that the men must have left.

Hodges gave a statement to the police. Her purse was later returned to her. She stated that, during the incident, she was "scared to death."

On cross-examination, Hodges testified that she never saw the Defendant during the episode.

Lois Stockton testified that she owned the Nail Station. She was at the salon at the time in question, attending to a customer who was purchasing a gift certificate. She saw two men approach the front door, and she "wondered why someone dressed the way they were dressed would come to the business." She described their clothing as "long saggy pants" and hooded sweatshirts. When they entered the store, she immediately said, "May I help you?", but they ignored her and walked over to one of the nail technicians, where they inquired about prices. Stockton continued, "and the next thing I saw was a gun. All down on the floor, face down, now. And that's all – I saw a white hood and a gun." She stated that she got down on the floor as instructed. She got up only after she realized the men had left. She discovered that her cell phone and the customers' purses were missing. Money was also taken from Erika Dailey's station. Stockton testified that the experience was "horrifying."

On cross-examination, Stockton stated that she did not see the Defendant in her salon that day.

Katherine Patricia Moore testified that she was getting a manicure at the Nail Station on the afternoon in question. She glanced over her shoulder and saw "a person and his attire." She turned back to talk to her technician about what he was wearing, which she described as "everything was down about knee level with about that much underwear showing and he had on a belt with studs on it and a white hoodie." When Moore looked in the mirror next to her, she noticed that the man was pointing a gun at someone. At the same time, she heard him say, "get on the ground." She did as instructed. She did not see a second person. She testified that she was "frightened" during the episode.

After Moore got back up, she saw that her purse was missing. Her purse was later returned to her by the police.

On cross-examination, Moore testified that the assailant she saw was not the Defendant.

Donna Reed testified that she was at the salon for a pedicure at the time in question. She looked up from where she was sitting in the pedicure room and saw "a man in a white hood." She then made eye contact in the mirror with another man who was wearing a black "hood." She testified, "He walked over toward the door and looked directly at me and pointed the gun and said get in the floor and count to a thousand." She was "[a]fraid for [her] life" and got down on the floor and began counting. Reed heard the man ask Dailey where the money was, and Dailey told him it was under the pillow. She and Dailey continued to count as instructed until other people in the salon told them they could stop. She stated that nothing was taken from her. She reiterated that her assailant had pointed the gun at her.

On cross-examination, Reed stated that she did not recall seeing the Defendant in the salon.

Angela Galloway testified that she worked at the Nail Station and that Stockton is her mother. On the afternoon in question, Galloway was giving Moore a manicure. She saw two young men enter the store, separated by five or six seconds. They were dressed "[l]ike teenagers." When she noticed that the shorter of the two men was holding a gun, she "[s]creamed as loud as [she] could." When the man told everyone to get on the floor, she did so, but lay on her back so that she "could basically watch what he was going to do." Galloway watched the shorter man collect "at least four to five purses." She testified that she was "scared" and "frightened" when she saw the gun.

After the men left, Galloway got up and ran after them in an attempt to see "what type car they were going to get into to get away." As she looked out, she first saw the two young men go to the left. She went after them, and, as they approached her, she told them to "put the purses down and go the other way." They did not and instead ran off. She saw them get into a car, which then drove off.

On cross-examination, Galloway acknowledged that she was not able to identify either of the men who had entered the salon.

Eric Mayse testified that, on the afternoon of December 23, 2009, he was in the Nail Station to buy a gift certificate for his wife. He was speaking with the salon owner when he saw two young men walking around outside. He "noticed the way they were dressed, they didn't look like the regular clientele of this shop." They entered the shop, and the owner asked if she could help them. The two men ignored her and walked over to one of the technicians. They asked, "how much does it cost to get my momma's nails did [sic]?" The men turned away and, after walking a couple of steps, one of them "produced the gun." According to Mayse, the man "held it out, kind of waved it around, kind of made sure that

[they] all saw it. And the next thing he said was 'everybody get down and put your heads down.'" Mayse followed these instructions. He described the encounter as "terrifying."

Mayse could hear the two men walking around the shop. They approached him and he felt a pat on his hip as if someone was checking for his wallet. Nothing was taken from him, however. After they left, Mayse got up and went to the shop next door to let someone know what had happened. As he was looking around, he "noticed the two assailants were still out in the parking lot walking around looking kind of aimlessly." He yelled, "there they are right there," and the two assailants ran off. They ran around a fence to a blue Taurus. They got into the car and drove off "[p]retty fast." The police arrived within thirty seconds, and Mayse told them about the car and the direction in which it was headed.

On cross-examination, Mayse stated that he did not see a car waiting for the two men at the time they left the salon.

Gina Crawford testified that she worked at the salon and that she was the owner's niece. On the day in question, she had just finished doing the nails of a client named "Dianne," and Dianne was at the drying station. As Crawford started working on another client's nails, two men entered the store. They approached her and inquired about prices. After she responded, both men pulled out guns and told everyone to get on the floor. She saw a gun pointed at her, causing her to feel "scared." She got down on the floor on one knee and watched the men. She saw one of them going around and picking up purses, including Dianne's. The other man was asking Dailey where the money was and, after Dailey told him, he returned to the front of the store and got the money from under the pillow. The men then left the store and turned left.

Crawford got up and called 9-1-1. She then went outside in hopes of seeing the two men get into a vehicle. Eventually, she saw the two men get into a blue sedan. She got into a car with another client that had just pulled up, and they followed the sedan. Crawford described the sedan as "a dark colored car and it was either a Sable or a Taurus and it had a red sticker on the back of it, Pyramid used cars, and the license plate." She stated that she wrote down the license number, "947VTQ." Her handwritten note of the license number was admitted as an exhibit. Crawford also identified photographs of the car.

As Crawford and the client were following the sedan, the police got involved in the chase. Crawford described the police chase as "zigzagging." Crawford then lost sight of the sedan, but she saw it again after it was wrecked at the corner of Highland and Walnut Grove Street. At that point, she stated, the car was empty and policemen were "everywhere."

On cross-examination, Crawford acknowledged that she had been able to identify one of the assailants, Emmanuel Perry. She was not able to identify the other man. She also

acknowledged that, after the two men left, "no car was immediately there." Rather, the men initially turned left after leaving the shop and then passed back in front of the store before they got in a waiting car.

Jeremy Manns, nineteen years old, testified that he had pled guilty the previous week to five counts of aggravated robbery and four counts of aggravated assault for his participation in the events at the Nail Station. He testified that he and "Perry" committed the robbery and that "Tez" was the driver. Manns identified the Defendant as "Tez."

Manns stated that he was eighteen at the time of the robbery, and the Defendant was twenty-four. The Defendant picked him up that day and they went to the Defendant's house. Perry was with them. The Defendant went inside and came back out with a gun. Perry told the Defendant to drive them to the Nail Station because Perry had a brother that worked there.

Manns stated that he was wearing a white hoodie. The Defendant gave him the gun, and Manns took it into the salon. Perry went with him. Perry asked someone about the prices. Manns pulled the gun and told everyone to get on the ground. Manns then picked up purses and some money. At one point, he gave the gun to Perry, who took it to the back of the salon. After he and Perry left the store, they "just started running down the street" to get away. They saw the Defendant driving down the street and "flagged him down." The Defendant stopped, and they got in the car. Manns was carrying purses at the time and took them into the backseat with him. The Defendant asked if anyone was following them. At this point, Perry had the gun.

Manns stated that they drove off, and then the police got behind them. They subsequently had a wreck and jumped out of the car. All three of them ran but were captured by the police.

On cross-examination, Manns acknowledged having given an affidavit in April 2010 in which he asserted that the Defendant had no knowledge of the robbery. He also acknowledged that he "never talked to [the Defendant] about robbing the Nail Station."

On redirect examination, Manns acknowledged discussing the robbery with Perry while they were in the car with the Defendant. Perry was sitting next to the Defendant at the time. Manns was ambivalent, however, as to whether the Defendant heard them. Manns also stated that the conversation took place in front of the Nail Station and that the Defendant gave him the gun. On re-cross examination, Manns stated that he had not talked to the Defendant about the robbery.

Emmanuel Perry testified that he was sixteen in December 2009. As a result of the episode at the Nail Station, he pled guilty to five counts of aggravated robbery and four counts of aggravated assault. On the morning of December 23, 2009, he called the Defendant to come get him. The Defendant picked him up in a Ford Taurus. They then went and picked up Manns. Perry told the Defendant to drive them to the Nail Station. After the Defendant drove them there, Perry and Manns "got the gun and [the Defendant] drove off." Perry denied that there had been any conversation about the robbery, stating,

> we told him that we was fixing to go there. I was fixing to see how much it going [sic] to cost to get my mother's nails did [sic] for Christmas and he dropped us off and he said he was going to go run an errand and he asked when we was [sic] going to get picked back up and I said I'm going to call you. All right. He dropped us off and we went in. Me and [Manns] went in. And that's when we did the crime.

Perry then acknowledged having previously testified that the Defendant gave him the gun and spoke to him about the robbery and how it should be done. He maintained that his earlier testimony was false, however, and reiterated that the Defendant "didn't have anything to do with the robbery."

When the prosecutor asked, repeatedly, how Perry knew the Defendant, Perry replied, "I'm a Vice Lord, sir." Perry then added that the Defendant was also a Vice Lord. On questioning, Perry explained that he had been in the organization two or three years at the time of the crimes and did not hold any rank. He also stated that he was not aware of any rank held by the Defendant. Perry denied that the Vice Lords was a "gang."

On cross-examination, Perry maintained that he and Manns planned the robbery by themselves and did not discuss it with the Defendant. He denied that he had gotten the gun from the Defendant. He also testified that those portions of his statement to the police implicating the Defendant were false.

Phillip Gooch testified that he was a police officer for the city of Bartlett and "assigned to the FBI task force as a robbery investigator." He assisted in the investigation of the instant case. He took statements from Manns and Perry. Perry's mother was in attendance during their interview. Officer Gooch explained that he first interviewed Perry and then asked if Perry would make a written statement. When Perry agreed, he reinterviewed Perry and typed the questions and answers. He then gave the document to Perry to review for accuracy. Perry did so and then signed it. Perry's mother also read and signed it. The statement was entered as an exhibit.

In his statement, Perry implicated the Defendant as a participant in the robbery:

I was at home and just woke up and [the Defendant] came and picked me up. He asked me to come ride with him. I said "ok." I told him I needed to get my haircut and he said, "no, we will do it later." We went and got [Manns]. [The Defendant] took us to 4646 Poplar. He pulled on the side of the building where the nail shop was. He explained how he suggest it be done. He went in the glove compartment and got the gun. It wasn't loaded. He handed it to [Manns] because I said I wasn't going to stick anybody up. I went in the building and [Manns] came after me. I went to one of the workers and asked how much it would cost to get my momma's nails did [sic], because I was spooked and wasn't ready to do it. I turned around and started heading back towards the door and that's when [Manns] pulled out the gun and said for everyone to get down. After I heard that, that's when I turned around and helped. He handed me the gun because he saw someone on the phone. So I went and asked her to drop the phone and then [Manns] asked "where is the money." She told him it was under the pillow on the table. Then he grabbed the money and I walked out the door. Me and [Manns] walked up the street and we got in the car. Then we drove off. Then the police started following us and then [the Defendant] wrecked the car. That's when we all got out. The police got us all.

Officer Gooch testified that he did not threaten or coerce Perry or promise him anything in return for his statement. Perry's mother was in the room with Officer Gooch and Perry the entire time and raised no objections.

On cross-examination, Officer Gooch acknowledged that suspects had lied to him in the past.

Officer David Simpson of the Memphis Police Department responded to the Nail Station's reports of a robbery. He got a description of the car that the suspects had been seen entering and called it in. He also participated in the chase. The suspect car, a blue Ford Taurus, hit another car and then "veered into somebody's front yard." Officer Simpson saw two people get out of the car and take off running. He proceeded to chase them on foot. Officer Simpson eventually apprehended the two individuals, one of whom he identified as the Defendant.

Officer Kerby Windless of the Memphis Police Department testified that he, also, responded to the scene. He participated in the chase of the blue Taurus but did not pursue anyone after the Taurus wrecked.

Officer Bobby Johnson of the Memphis Police Department testified that, on the day in question, he was driving an unmarked police car in the vicinity of the Nail Station. After the blue Taurus wrecked, he participated in the search for the third person. He apprehended Perry about one-quarter mile from the crash scene.

Sergeant Marlon Wright of the Memphis Police Department responded to the Nail Station as a member of the crime scene unit. He also responded to the wrecked blue Taurus. He took photographs at each scene. Several purses were found in the back seat of the Taurus. He did not recall finding a gun in the car.

Officer Newton Morgan of the Memphis Police Department testified that he processed the blue Taurus. He was unsuccessful in obtaining any fingerprints from the car. He found a black and yellow jacket, a black baseball cap, a black makeup kit, and a red wallet in the car, however.

Martha Jackson testified that she was a retired court reporter and worked part-time doing administrative tasks for the court system. She collected the audio recording made of Perry's guilty plea. A portion of the recording was played for the jury, and the recording was made an exhibit to the record. The recording reflects that, during his guilty plea, Perry testified, under oath, that it was the Defendant's idea that they go to the Nail Station; that the Defendant suggested what Perry and Manns do in the salon, i.e. "go in there, come out with money"; that the Defendant gave them suggestions as to how to commit the robbery; that the Defendant got the gun out of the car's glove compartment; and that the Defendant told them he would be waiting for them in the car.

Sergeant Vernon VanBuren of the Memphis Police Department testified that he was a robbery investigator. He reported to the scene of the wrecked car driven by the Defendant. He recovered three handbags from the car's interior.

Walter Gunn of the United States Attorney's Office testified that he was formerly employed by the Memphis Police Department and was assigned to the "safe streets task force." He was the lead investigator of the instant case. Sgt. VanBuren turned the recovered handbags over to him, and they were subsequently returned to the victims.

The State rested its case after Investigator Gunn finished testifying. The defense put on no proof. The jury convicted the Defendant of all counts as charged. At the sentencing hearing, the State introduced proof without objection that the Defendant had four prior convictions for kidnapping and one prior conviction for aggravated robbery, all of which were committed on the same day. Upon determining that the kidnapping offenses satisfied the definition of a violent felony for purposes of determining the Defendant's sentencing range, the trial court concluded that the Defendant was a persistent offender. The trial court

also determined that the Defendant had other prior convictions sufficient to establish "a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range," and that he was the leader in the commission of offenses involving two or more criminal actors. Nevertheless, the trial court sentenced the Defendant to the minimum term of twenty years for each of the aggravated robbery convictions and to the minimum term of ten years for each of the aggravated assault convictions. The trial court then found that the Defendant is a particularly dangerous offender and ordered partial consecutive sentencing for an effective sentence of seventy years.

In this direct appeal, the Defendant contends that the trial court erred in (1) allowing "cumulative" witnesses to testify; (2) allowing a witness to testify about the Defendant's gang involvement; (3) admitting the recording of a co-defendant's guilty plea; (4) admitting testimony about information previously redacted from a co-defendant's statement to the police; and (5) refusing to admit a police report containing the Defendant's statement. The Defendant also challenges the sufficiency of the evidence supporting his convictions and his sentence. We will review each of these issues in turn.

## Analysis

### *Cumulative Witnesses*

The Defendant complains that the trial court should not have allowed all of the victims to testify because they were "not relevant to the trial of the Defendant" and, therefore, their testimony was a "waste of time" and "cumulative" in contravention of Tennessee Rule of Evidence 403. This issue is without merit.

Our rules of evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Tenn. R. Evid. 401, and provide that relevant evidence is generally admissible, but that "[e]vidence which is not relevant is not admissible." Tenn. R. Evid. 402. Our rules of evidence further provide, however, that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. We will not overturn a trial court's application of these definitions to proffered evidence absent an abuse of discretion.[1] See State v. Jackson, 52 S.W.3d 661, 669 (Tenn. Crim. App. 2001); State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

---

[1] Without citation to authority, the Defendant repeatedly "requests" in his brief that this Court apply a de novo standard of review with respect to his issues. We decline to honor these requests.

The Defendant was charged with five counts of aggravated robbery. Each of these counts involved a different victim. The testimony of (or about) each of these victims was, therefore, relevant to prove the respective charge. As pointed out by the State in its brief, in order to establish the offense of aggravated robbery, the State must prove that the accused accomplished the robbery "by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006); see also Tenn. Code Ann. § 39-13-402(a)(1) (2006). Four of the aggravated robbery victims in this case testified to the fear she experienced during the robbery. Each of these victims also testified that the robberies were committed by Perry and/or Manns brandishing a gun and ordering everyone to the floor. That each of these witnesses did not testify to seeing the car driven by the Defendant did not render her testimony irrelevant because the Defendant was convicted on the basis of his criminal responsibility for the actions of Manns and Perry. See Tenn. Code Ann. § 39-11-402(2) (2006) ("A person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]"). The trial court committed no error in allowing four of the five aggravated robbery victims to testify.[2]

The same analysis applies to the victims of the four aggravated assault offenses with which the Defendant was charged. Aggravated assault as charged in this case is committed when the perpetrator intentionally or knowingly causes another to reasonably fear imminent bodily injury and uses or displays a deadly weapon. See Tenn. Code Ann. §§ 39-13-101(a)(2) (Supp. 2009) & 39-13-102(a)(1)(B) (Supp. 2009). Again, each of the victims of the charged aggravated assaults was called to testify by the State as to his or her fear during the offense. This proof was relevant and not cumulative as to each victim and each charge. The trial court committed no error in allowing each of the aggravated assault victims to testify. The Defendant is entitled to no relief on this basis.

*Proof of Gang Involvement*

The Defendant also complains that the trial court committed reversible error in allowing the State to adduce testimony about the Defendant's membership in a gang. The State disagrees.

Prior to trial, the defense filed a motion in limine seeking to exclude "any prejudicial references to gang involvement and/or gang activity." At the hearing on the motion, the

---

[2] The indictment identifies "Diane Eger" as the fifth aggravated robbery victim. While Eger did not testify at trial, Gina Crawford testified that she had just finished doing "Dianne's" nails and that Dianne was in the drying area when Perry and Manns entered the store, brandished a gun, and then left with Dianne's purse.

prosecutor argued that the Defendant's co-defendants claimed that the Defendant held rank in a gang to which they also belonged. The prosecutor's theory was that the Defendant, as a ranking gang member, sent the two younger members into the Nail Station to commit the crimes and that this proof went to the Defendant's criminal responsibility for the actions of his co-defendants. The defense argued that, even if this proof was relevant, it was unduly prejudicial. The trial court ruled as follows:

> I would not allow any reference to gang membership or just gang terminology just gratuitously in order to, you know, because it might – the jury might be prejudiced by that and it's not probative of anything.
>
> However, if – if it's the basis, and I take this again, we'll see it when the proof unfolds, but if it's the basis that one witness says he knows [the Defendant] because they're gang members together or they were operating together, I think that certainly goes to what we're about here and the jury can credit that or not.
>
> And so, while it might be prejudicial, it's certainly relevant and I would allow it under those circumstances.
>
> But not, again, just for references to [the Defendant] as a gang member per se or something, that would not be appropriate and would be prejudicial and not relevant so I would not allow it.

During a subsequent bench conference at trial, the judge stated that he denied the defense motion in limine regarding gang affiliation because it was relevant to "the relationship between" the Defendant and Perry.

At trial, during the State's direct examination of Perry, the following colloquy took place:

Q. How do you know [the Defendant]?

A. From the neighborhood, sir.

Q. Is that the only way?

A. I'm a Vice Lord, sir.

Q. Yes, sir.

A. Yes, sir. He's Vice Lord, sir, but I know [sic] him before then, way before then.

Q. So, you're both in the same organization together.

A. Yes, sir.

Q. Does this organization have any sort of rank structure?

A. Everything does, sir. Yes, sir.

Q. How old are you?

A. I'm seventeen now, fixing to be eighteen.

Q. When you were sixteen, how long had you been in the [V]ice [L]ords?

A. About two or three years.

Q. Did you hold much rank?

A. No, sir. I held any [sic] rank at all, sir.

Q. What about [the Defendant]?

[Defense counsel objected on the grounds of relevance, and the trial court overruled the objection.]

A. Would you repeat the question, sir?

Q. Does [the Defendant] hold any rank?

A. Not that I know of.

Q. Would you know who holds rank in the organization?

A. Yes, sir, I do.

Q. Who's the head of your clique?

A. My clique?

Q. Yeah, who is in charge of your mob?

A. He's not here, sir, so I don't – I don't want to put his name out there like that, sir.

Q. What rank would that person hold?

A. He will hold –

[Defense counsel objected.]

The Court: I'll sustain. I think we've gotten past where we need to be. I think – and I'll tell you, ladies and gentlemen, don't worry about the things – when I sustain an objection or different things don't consider that. I did allow and I think it's relevant for [the prosecutor] to ask Mr. Perry if he knows of any rank or whatever, as to the rest of that, don't worry about that and we'll go forward from there.

Q. Without holding any rank, would you have to do what somebody with rank told you to do?

A. No, sir. In a gang you would have, not in an organization, sir.

Q. In your gang?

A. I'm not in a gang, sir.

Q. The Vice Lords aren't a gang?

A. No, sir.

The Defendant contends that the trial court violated Tennessee Rules of Evidence 403 and 404(b) by admitting this proof and, therefore, that he is entitled to a new trial. We disagree.

As set forth above, our rules of evidence provide that proof is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. Additionally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn.

R. Evid. 404(b). This Court has recognized that proof of a defendant's gang affiliation "is character evidence subject to Rule 404(b)." State v. Erik Guerrero, No. M2010-00851-CCA-R3-CD, 2011 WL 3107722, at *12 (Tenn. Crim. App. July 25, 2011), perm. app. denied (Tenn. Nov. 17, 2011) (citing State v. Orlando Crayton, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App. June 1, 2009)); see also State v. Ronald Eugene Brewer, Jr., No. E2010-01147-CCA-R3-CD, 2011 WL 2732566, at *16-17 (Tenn. Crim. App. July 14, 2011), perm. app. denied (Tenn. Sept. 21, 2011); State v. Carlos D. Haywood, No. 02C01-9707-CR-00289, 1998 WL 855436, at *4-5 (Tenn. Crim. App. Dec. 11, 1998). Thus, proof of a defendant's gang affiliation "is clearly inadmissible if its only purpose is to establish that the defendant acted in conformity with his bad character or to demonstrate that he had a propensity to commit a crime." Carlos D. Haywood, 1998 WL 855436, at *5 (citing Bunch v. State, 605 S.W.2d 227, 230 (Tenn. 1980)).

While an individual's gang affiliation may not be admitted as propensity evidence, Rule 404(b) provides that it "may, however, be admissible for other purposes." Tenn. R. Evid. 404(b). Such other purposes include "(1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation." State v. Berry, 141 S.W.3d 549, appx 582 (Tenn. 2004) (citing State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201 (Tenn. Crim. App. Jan. 22, 2003)); see also Tenn. R. Evid. 404 adv. com. cmt.; State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985); State v. Jones, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999). When the trial court substantially has complied with Rule 404(b)'s procedural requirements,[3] we will reverse its decision to admit evidence under Rule

_____

[3] Prior to a trial court admitting evidence of other crimes, wrongs, or acts, the following conditions must be satisfied:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The Defendant concedes in his brief that he did not request a jury-out hearing when the prosecutor began this line of questioning. During a subsequent bench conference, however, the trial court explained that it found this proof relevant to the relationship between Perry and the Defendant. The gist of the Defendant's argument on this issue focuses on the trial court's determination that the probative value of
(continued...)

-15-

404(b) only upon an abuse of discretion. State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008).

We hold that the trial court committed no abuse of discretion in admitting Perry's testimony about the Defendant's gang affiliation. The proof was limited in scope and consisted primarily of Perry's assertion that he and the Defendant were both members of the Vice Lords "organization" and that the Defendant held no rank of which he was aware. The State's theory was that the Defendant was criminally responsible for the aggravated robberies and aggravated assaults committed by Perry. Proof of their mutual membership in the Vice Lords was relevant to establish the relationship between the Defendant and Perry, as well as the Defendant's intent and motive for picking up his co-defendants at the scene, fleeing, and attempting to elude the police. Moreover, the probative value of this proof was not outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b)(4).[4] Accordingly, the Defendant is entitled to no relief on this issue.

*Admission of Recording of Perry's Guilty Plea*

The day after Perry testified, the State put on proof of his guilty plea testimony through another witness. This proof – an audio recording of Perry taking the oath to testify truthfully and then answering questions about the circumstances of the instant offenses – implicated the Defendant in the crimes committed at the Nail Station. Prior to the admission of this proof, the defense lawyer objected, stating, "I think in all due fairness can we have Mr. Perry back? Since I can't cross examine a recording?" The trial court overruled the objection on the basis that the defense had previously cross-examined Perry.[5] The defense did not object specifically to the admission of the audio recording. The Defendant now argues that his constitutional rights to confrontation were violated.

---

[3](...continued)
the evidence was not outweighed by the danger of unfair prejudice, not on any failure by the trial court to comply with the procedural requirements of 404(b).

[4] Consequently, the probative value of this proof also was not substantially outweighed by the danger of unfair prejudice under Tennessee Rule of Evidence 403.

[5] During Perry's testimony, the prosecutor sought to play the recording and question Perry about it. The judge denied the prosecutor's request, stating, "I think you've been through them orally with him and I think he made that allocution. He very clearly said he lied when he made it so I don't see any real need to play the allocution."

-16-

Because the Defendant failed to raise this issue in his motion for new trial,[6] we may review it only for plain error. See Tenn. R. App. P. 3(e); State v. Terry, 118 S.W.3d 355, 359-60 (Tenn. 2003); State v. Adkisson, 899 S.W.2d 626, 636 (Tenn. Crim. App. 1994). This Court has the discretionary authority to grant relief for plain error when all of the following five prerequisites are satisfied: "'(1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.'" State v. Jordan, 325 S.W.3d 1, 58 (Tenn. 2010) (quoting State v. Banks, 271 S.W.3d 90, 119-20 (Tenn. 2008)).

Both the federal and state constitutions provide criminal defendants with the right to confront those who testify against them. See U. S. Const. Amend. VI; Tenn. Const. art. I, § 9. "In order to protect a defendant's right to confrontation, before the prior testimony of a witness will be admitted, the State must show that (1) the witness is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness." State v. Calvin Eugene Bryant, Jr., No. M2009-01718-CCA-R3-CD, 2010 WL 4324287, at *17 (Tenn. Crim. App. Nov. 1, 2010), perm. app. denied (Tenn. Apr. 13, 2011) (citing Crawford v. Washington, 541 U.S. 36, 68 (2004)). Here, although the defense had a prior opportunity to cross-examine Perry, the State made no showing whatsoever that he was unavailable at the time the recording was played for the jury. Rather, the trial court denied defense counsel the opportunity to recall Perry to the stand. In so doing, the trial court erred.

Nevertheless, we hold that the trial court's error did not adversely affect a substantial right of the Defendant and that consideration of the error is not necessary to do substantial justice. Perry testified at the trial that he was lying during his guilty plea. He stated repeatedly that the Defendant was not aware of his and Manns's plan to commit crimes at the Nail Station. Had the defense been allowed to recall Perry and cross-examine him about his guilty plea, it is clear that he simply would have reiterated his earlier trial testimony. Accordingly, we hold that the Defendant is not entitled to plain error relief on this issue.

The Defendant also contends that the admission of the guilty plea recording was "unfairly prejudicial" and, therefore, it should have been excluded under Tennessee Rule of Evidence 403. The thrust of the Defendant's briefed argument, however, and the argument raised in his motion for new trial, is that the recording should have been excluded as cumulative because the gist of Perry's admissions during his guilty plea had already been explored during his trial testimony. The Defendant did not raise this objection at trial, and

_____

[6] In his motion for new trial, the Defendant complained only that the recording should have been excluded under Tennessee Rule of Evidence 403.

his contention is therefore waived.  See Tenn. R. App. P. 36(a); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988).

Moreover, as set forth above, we review a trial court's determinations about whether evidence should be excluded under Rule 403 for an abuse of discretion.  See State v. Young, 196 S.W.3d 85, 105 (Tenn. 2006).  Here, we see no such abuse.  The level of the Defendant's participation with his co-defendants in committing the crimes was the key issue at trial. Perry testified differently at trial than he did at his guilty plea.  The State was entitled to explore these differences.  Moreover, as acknowledged by the Defendant in his brief to this Court, Tennessee Rule of Evidence 613(b) provides for the admission of extrinsic evidence of a witness's prior inconsistent statement.  Although the trial court should have allowed the defense to recall Perry to the stand, nevertheless the Defendant is not entitled to relief on this issue.

*Manns's Testimony About Prior Statements*

The Defendant also purports to raise an issue about the State's questioning Manns about his prior statement to the police.  Prior to trial, the defense filed a motion to sever the Defendant's trial from that of his co-defendants and, also, a motion to "exclude from trial all references to the [D]efendant as stated in the police confessions of his co-defendants, Emmanuel Perry and Jeremy Manns."  The trial court denied the motion to sever but granted the motion to exclude (i.e., redact) references to the Defendant contained in Perry's and Manns's statements.  Subsequently, Perry and Manns pled guilty to the instant charges, resulting in the Defendant being tried by himself.  As set forth above, both of the Defendant's co-defendants testified at the Defendant's trial.

During the State's direct examination of Manns, the defense objected that the prosecutor was "asking a question that's not in the redacted statement."  The trial court overruled the objection on the basis that the Defendant's trial had been "severed" and that Manns was available for cross-examination.  The Defendant contends on appeal that the trial court erred.

As best we can determine, the Defendant is alleging a Bruton error.  In Bruton v. United States, 391 U.S. 123, 126 (1968), the United States Supreme Court held that the federal confrontation clause bars the admission at a joint trial of a *non-testifying* co-defendant's pretrial statement that incriminates the defendant.  In order to avoid a Bruton error, our rules of criminal procedure offer three alternatives:

> If a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the state intends to offer the

statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:

(A) a joint trial at which the statement is not admitted in evidence or at which, if admitted, the statement would not constitute error;

(B) a joint trial at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant; or

(C) severance of the moving defendant.

Tenn. R. Crim. P. 14(c)(1). We note that these three choices are in the disjunctive. In this case, the Defendant was, in effect, "granted" a severance when his co-defendants pled guilty. Accordingly, avoidance of a Bruton error no longer required that Perry's and Manns's statements to the police be limited in their content with respect to implicating the Defendant.

The Defendant has failed to establish that the trial court committed any error in overruling his objection at trial. Accordingly, he is entitled to no relief on this issue.

*Exclusion of Defendant's Statement*

During her cross-examination of Detective Gunn, defense counsel attempted to question him about a supplemental report he prepared reflecting his conversation with the Defendant. The State objected that the defense was attempting to introduce inadmissible hearsay consisting of the Defendant's self-serving statements. The defense argued that the supplement was a business record and, therefore, admissible as an exception to the general rule against the admission of hearsay. The trial court sustained the State's objection. The Defendant now complains that the trial court erred.

This Court has recognized that the determination of whether an out-of-court statement meets the definition of hearsay[7] "is a question of law." Gilley, 297 S.W.3d at 760. If the statement is hearsay, and no exceptions to the general rule prohibiting the admission of hearsay apply, then "the statement is, purely and simply, inadmissible." Id. In such event, the trial court "has no discretion to hold otherwise, and to utilize an abuse of discretion standard at this point in the analysis would have us defer to a discretion that the trial court

---

[7] Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible absent an applicable exception set forth in our rules of evidence "or otherwise by law." Tenn. R. Evid. 802.

does not possess." Id. (internal quotation marks omitted) (citing State v. Edison, 9 S.W.3d 75, 78 (Tenn. 1999)). Thus, this Court applies a de novo standard of review when reviewing a trial court's ruling that an out-of-court statement is or is not hearsay. See id.; see also Willie Perry, Jr. v. State, No. W2011-01818-CCA-R3-PC, 2012 WL 2849510, at *7 (Tenn. Crim. App. July 11, 2012) (Bivins, J., concurring).[8]

Initially, we note that the defense did not proffer a copy of the supplemental police report into the record. Therefore, we are unable to review its evidentiary merit. When the record does not contain the necessary information for our review, we presume that the trial court's ruling was correct.[9] See State v. Griffis, 964 S.W.2d 577, 592-93 (Tenn. Crim. App. 1997).

Moreover, as a general matter, our supreme court has made clear that a defendant's self-serving statements to the police are not admissible at trial:

> A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.

---

[8] The Tennessee Supreme Court has recognized that a trial court's erroneous application of a rule of evidence, i.e. an error of law, is an abuse of discretion. See Jordan, 325 S.W.3d at 48-49 (holding that the trial court abused its discretion when it "applied an incorrect legal standard and thereby committed error" in denying the capital defendant's motion seeking relief from the rigid application of Tennessee Rule of Evidence 615 to the capital defendant's sentencing hearing) (citing Benn v. United States, 801 A.2d 132, 141 (D.C. 2002)). This is because an abuse of discretion is defined as including the application of an incorrect legal standard. Banks, 271 S.W.3d at 116. As the United States Supreme Court has stated, "A [trial] court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100 (1996). Thus, "[t]he abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." Id. Properly applied, then, either standard of review will result in the same determination of error or no error in a trial court's decision that a given statement does or does not meet the definition of hearsay.

[9] We note that the Defendant has attached to his brief a copy of a document that appears to be Detective Gunn's transcribed notes concerning the instant crimes. In the upper right-hand corner of this document appears the handwritten notation "Appendix 1." As this Court has previously observed, attachments to briefs are not part of the record on appeal. State v. Price, 46 S.W.3d 785, 812 (Tenn. Crim. App. 2000); see also Tenn. R. App. P. 24(a). This Court will not consider matters attached to a litigant's brief that have not been made a part of the record. See State v. Matthews, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990). Moreover, Tennessee Rule of Appellate Procedure 28 sets forth the procedure for creating an appendix to an appellate brief. The Defendant's attachments do not comport with Rule 28.

<u>State v. King</u>, 694 S.W.2d 941, 945 (Tenn. 1985) (quoting <u>State v. Wiseman</u>, 643 S.W.2d 354, 366 (Tenn. Crim. App. 1982)); <u>see also</u> <u>State v. Brooks</u>, 909 S.W.2d 854, 862-63 (Tenn. Crim. App. 1995). Additionally, police reports are expressly excluded from the hearsay exception for public records and reports, <u>see</u> Tenn. R. Evid. 803(8), and do not fall within the definition of the hearsay exception for business records because the witness/defendant declarant is not under a business duty to give the information. <u>See</u> Tenn. R. Evid. 803(6); <u>see also</u> <u>State v. Allen</u>, 692 S.W.2d 651, 653 (Tenn. Crim. App. 1985); <u>State v. Michael Brady</u>, No. M1999-02253-CCA-R3-CD, 2001 WL 30220, at *9 (Tenn. Crim. App. May 14, 2001). The Defendant is entitled to no relief on this issue.

*Sufficiency of the Evidence*

The Defendant also appears to challenge the sufficiency of the evidence underlying his convictions. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). <u>See also</u> Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. <u>State v. Evans</u>, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. <u>State v. Harris</u>, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." <u>Id.</u> (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (citing <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (Tenn. 2009)). In <u>Dorantes</u>, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." <u>Id.</u> at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. <u>Id.</u>

As charged in this case, aggravated robbery is committed upon "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a), "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." <u>Id.</u> § 39-13-402(a)(1). The proof at trial established that Perry and Manns committed the armed robberies of Erika Dailey, Charlotte Hodges, Lois Stockton,

"Dianne,"[10] and Patricia Moore.[11] The proof also was sufficient for the jury to conclude that the Defendant provided the gun with which the robberies were committed, advised Perry and/or Manns about how to commit them, and assisted Perry and Manns in their attempt to leave the scene of the crimes and avoid apprehension. Our criminal code provides that

> A person is criminally responsible for an offense committed by the conduct of another, if: . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2). The proof was sufficient to establish that the Defendant acted with the intent to promote or assist in the commission of the five aggravated robberies and that he aided Perry and Manns in their commission of the five aggravated robberies. Accordingly, the proof is sufficient to support the Defendant's five convictions of aggravated robberies committed at the Nail Station.

For the same reasons, the proof supports the Defendant's convictions of four counts of aggravated assault committed against Angela Galloway, Eric Mayse, Donna Reed, and Gina Crawford. As charged in this case, aggravated assault is committed when the perpetrator intentionally or knowingly causes another to reasonably fear imminent bodily injury and uses or displays a deadly weapon. Tenn. Code Ann. §§ 39-13-101(a)(2) & 39-13-102(a)(1)(B). The proof established that Perry and Manns entered the Nail Station, pulled a gun, and ordered the people in the store to get on the floor. The victims all testified as to the fear they experienced during the commission of the crimes. The Defendant assisted Perry and Manns in their commission of these crimes in the same manner and to the same extent that he assisted them in their commission of the aggravated robberies. Therefore, the proof is sufficient to support his convictions of four counts of aggravated assault under the theory of criminal responsibility. The Defendant is entitled to no relief on this issue.

---

[10] Count 4 of the indictment identifies Diane Eger as the victim. Gina Crawford testified that she had just finished doing "Dianne's" nails and that Dianne was in the drying area when Perry and Manns entered the store and then left with Dianne's purse. Crawford did not testify about Dianne's last name or the spelling of her first name.

[11] Dailey, Hodges, Stockton and Moore each testified about the fear they experienced during the robberies. Although Dianne or Diane did not testify at trial, all of the victims testified that Perry and/or Manns brandished a gun and ordered everyone onto the floor. This proof is sufficient to support the element of violence as to Dian[n]e. See State v. McKinney, 74 S.W.3d 291, 305-06 (Tenn. 2002) (recognizing that "the use of a deadly weapon, such as pointing a gun at the victim, constitutes violence") (citing State v. Allen, 69 S.W.3d 181, 185 (Tenn. 2002)).

In his final issue, the Defendant contests his sentence, but his legal argument is unclear. At the Defendant's sentencing hearing, the only proof put on by the State was of the Defendant's prior convictions, including four kidnapping convictions and one aggravated robbery conviction, all committed on August 2, 2001. The trial court ruled that these prior felony convictions placed the Defendant in the "persistent offender" classification. See Tenn. Code Ann. § 40-35-107(a)(1) (Supp. 2009).

Our sentencing code defines a persistent offender as "a defendant who has received . . . [a]ny combination of five (5) or more prior felony convictions within the conviction class or higher, or within the next two (2) lower felony classes, where applicable[.]" Id. In this case, the Defendant was convicted of five aggravated robberies, a Class B felony,[12] and four aggravated assaults, a Class C felony.[13] Kidnapping is a Class C felony. See Tenn. Code Ann. § 39-13-303(b) (1997). Thus, the Defendant's four previous kidnapping convictions and the previous aggravated robbery conviction appear to place him in the persistent offender classification.

However, another portion of the persistent offender statute provides as follows:

> Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, or convictions for the offense of aggravated burglary under § 39-14-403, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions[.]

Tenn. Code Ann. § 40-35-107(b)(4). Thus, because the Defendant's prior convictions of kidnapping and aggravated robbery were all committed on a single day, unless the statutory elements of those offenses included serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim, these convictions cannot be counted individually.

As set forth above, aggravated robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a), "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code

---

[12] See Tenn. Code Ann. § 39-13-402(b).

[13] See Tenn. Code Ann. § 39-13-102(e)(1).

Ann. § 39-13-402(a)(1). Aggravated robbery also may be committed "[w]here the victim suffers serious bodily injury," even without the use or display of a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(2). This Court has determined that prior multiple convictions of aggravated robbery committed on the same day are not subject to the twenty-four-hour merger rule. See State v. Elmi Abdulahi Abdi, No. M2009-01614-CCA-R3-CD, 2010 WL 2977892, at *5-6 (Tenn. Crim. App. July 29, 2010), perm. app. denied (Tenn. Jan. 18, 2011).

Relying on the Elmi Abdulahi Abdi case, the trial court determined that kidnapping is also an offense "for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims." Tenn. Code Ann. § 40-35-107(b)(4). Accordingly, the trial court ruled, each of the Defendant's four kidnapping convictions satisfied the definition of a prior felony conviction for determining the Defendant's status as a persistent offender, in spite of the fact that each of the four kidnapping offenses had been committed on the same day. It is this determination that the Defendant challenges.

In 2001, kidnapping was defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty, "[u]nder circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a)(1) (1997).[14] We agree with the trial court that the terminology "exposing the other person to substantial risk of bodily injury" is the legal equivalent of "threatened bodily injury." Accordingly, the trial court committed no error in concluding that the Defendant's four prior kidnapping convictions each counted as a separate conviction for the purposes of determining his status as a persistent offender. Therefore, the record supports the trial court's conclusion that the Defendant is a persistent offender. Accordingly, he is subject to a Range III sentence. See Tenn. Code Ann. § 40-35-107(c). Indeed, while criticizing the trial court's determination that kidnapping is a violent felony such that multiple kidnapping convictions committed within twenty-four hours nonetheless will count as individual convictions, the Defendant also concedes in his brief that he is a persistent offender.

After determining that the Defendant was subject to Range III sentencing, the trial court sentenced the Defendant to the minimum term of twenty years for each of the aggravated robberies, see Tenn. Code Ann. § 40-35-112(c)(2) (2006), and to the minimum term of ten years for each of the aggravated assaults. See id. § 40-35-112(c)(3). The trial court then determined that the Defendant is a dangerous offender. See id. § 40-35-115(b)(4) (2006). Accordingly, the trial court ordered partial consecutive service for an effective

---

[14] Kidnapping also could be committed by confining another "in a condition of involuntary servitude." Tenn. Code Ann. § 39-13-303(a)(2). However, each of the Defendant's kidnapping convictions was entered on a charge of especially aggravated kidnapping, an offense not involving involuntary servitude. See Tenn. Code Ann. § 39-13-305 (1997).

-24-

sentence of seventy years in the Tennessee Department of Correction. The Defendant contends that the trial court abused its discretion in ordering partial consecutive service.

The Defendant has offered no authority for his contention that the trial court erred in ordering partial consecutive service. Therefore, this issue has been waived. <u>See</u> Tenn. Ct. Crim. App. R. 10(b).

## **Conclusion**

For the foregoing reasons, we affirm the judgments of the trial court.


_____
JEFFREY S. BIVINS, JUDGE